Dorothy WELCHANCE

v.

**Otis R. BOWEN, Secretary, Health and Human Services.**

No. 3:87–0070.

United States District Court,
M.D. Tennessee,
Nashville Division.

Oct. 26, 1989.

D.C. Daniel, Jr., Murfreesboro, Tenn., for plaintiff.

Darryl Stewart, Asst. U.S. Atty., Nashville, Tenn., for defendant.

## MEMORANDUM

MORTON, Senior District Judge.

### I. THE MAGISTRATE'S REPORT

In this case, parts I and II of the Report and Recommendation of the United States Magistrate are adopted in full as if copied verbatim herein. Likewise, the court adopts that portion of part III which discusses the appropriate standards of judicial review.

### II. THE RULES

■ The plaintiff/claimant in this matter unquestionably established a *prima facie* case of disability by proving that she had a severe impairment which, while not meeting a listing, did prevent her from performing her past work. After having done so, it then became the Secretary's burden to prove that the claimant could nevertheless perform other substantial gainful activity in the national economy. The Secretary now argues to this court that it met the burden through use of rule 201.19 of the "grids." The plaintiff, on the other hand, argues that 201.19 is inapplicable and that 201.17 should have been applied. Not surprisingly, rule 201.17 dictates a conclusion of "disabled." Because all parties involved in this case appear to have misinterpreted or misapplied the grids, some background discussion is appropriate.

As noted above, the burden of proof shifts to the Secretary after the plaintiff establishes a *prima facie* case of disability. Once the burden shifts, the Secretary must prove that the plaintiff can still perform substantial gainful activity in the national economy despite the fact that she has a severe impairment which prevents her from performing her past type of work. This effort by the Secretary is the fifth and final step of the disability evaluation process. If the Secretary cannot prove the claimant's ability to perform other substantial gainful activity, the claimant must be deemed disabled.

The Secretary can often meet his burden at step five through the use of the "grids" rather than presenting testimony from a vocational expert. Basically, the grids are a series of tables consisting of rules which direct a conclusion of "disabled" or "not disabled" after taking four factors into consideration. These four factors are the claimant's age, education, work experience, and "maximum sustained work capability." Each individual rule addresses whether a certain combination of these factors renders a person disabled or not. As is logical and experientially sound, a low age works in favor of a finding of "not disabled." On the other hand, low levels of education, work experience, and work capability push toward a finding of "disabled" since they are to a person's disadvantage when trying to adapt to a new job.

■ The underlying premise of the rules is that a person at certain levels of these factors may be presumed to be disabled, while persons with some different combination of levels of these factors may be presumed to be not disabled. In essence, the rules simply consist of evidentiary based assumptions that a vocational expert would come to the conclusion expressed by a rule if faced with a person sharing the characteristics described by that rule. Of course, this mechanism can only function properly if a rule accurately describes the person in question. Otherwise, the whole network of assumptions and presumptions fall apart. Therefore, the grids cannot be used to dictate a conclusion of "not disabled" when "the characteristics of the claimant do not *identically* match the description in the grid." *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524 (6th Cir.1981), *cert. denied* 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). However, if the disparity between the condition of the claimant and the description of the rule is not significant, the rule may still be used as a guide or framework to reaching a conclusion. As the disparity grows, of course, the usefulness of the rule as a framework declines proportionally. Since the grids do not consider nonexertional impairments in the calculation of maximum sustained work capability, the existence of a nonexertional impairment often accounts for the failure of any grid rule to accurately describe a

claimant. If the nonexertional impairment is significant, it is not even appropriate to use the grids as a framework for a decision. Rather, the Secretary will need vocational testimony to meet his burden of proof.

Of course, a rule can be used to dictate a conclusion of "disabled" if a claimant suffers from a nonexertional impairment in addition to having the characteristics listed by a rule which states a "disabled" conclusion. This is only logical. The theory behind the rules which state that a person is disabled is that any claimant described by that rule would not be able to perform any substantial gainful activity that exists in significant numbers in the national economy. If a claimant's exertional impairment renders her disabled when viewed in conjunction with her other vocational factors such as age, education, and experience, then naturally she would also be disabled if she suffered from a nonexertional impairment in addition to the exertional. The instant plaintiff argues that such is her case. She asserts that rule 201.17 describes her and therefore dictates a conclusion of "disabled" even without resorting to an examination of her nonexertional impairment.

■ The Secretary, on the other hand, contends that the claimant's nonexertional impairment is insignificant and that rule 201.19 so closely describes the claimant that the rule can be used as a framework for concluding that the claimant is not disabled. If substantial evidence within the record supports the Secretary's conclusion, it must be upheld by this court. If not, the court must determine whether substantial evidence allows only for one other rule to apply. If it does, then the conclusion of that rule will dictate the conclusion of this court concerning disability. On the other hand, if substantial evidence supports application of no rule, or two or more rules reaching opposite conclusions, the court must then decide whether to remand the case for further findings or to simply find in favor of the claimant on the ground that the Secretary cannot seek another bite of the apple after failing to meet his burden of proof.

## III. RULE 201.19

Rule 201.19 directs a conclusion of "not disabled" when the claimant has: (1) an age ranging from age 45 through 49, (2) a "limited or less" education, (3) work experience classified as skilled or semiskilled but not involving transferable skills, and (4) a maximum sustained work capacity to do sedentary work. Thus, the first basic question for the court is whether there is substantial evidence to support the Secretary's conclusion that each of these four classifications accurately describe the claimant.

The most obvious problem with applying rule 201.19 concerns the age classification. Rule 201.19 only governs individuals of ages 45 through 49. The plaintiff, however, did not turn 45 until October of 1987 —long after the alleged onset of disability. Naturally, this is not a problem which damages the Secretary's position since a younger age presumably makes a claimant more able to adapt to some other line of work, but clarity nevertheless demands that this court divide its analysis into the time periods before and after reaching age 45. The court will first examine the period after reaching age 45, and consequently the next step must be to determine whether the other three classifications listed in rule 201.19 accurately portray the claimant's condition.

■ The thrust of the plaintiff's attack against application of 201.19 is that the plaintiff is illiterate and that 201.19 cannot apply to persons who are illiterate. Interestingly, the Secretary now also appears to view the question of literacy as critical to whether 201.19 should be applied. While the literacy question is important, as will be discussed later, it is actually irrelevant to the application of rule 201.19. All parties appear to have failed to distinguish between the grid education classification of "limited or less" and the classification of "limited or less—at least literate and able to communicate in English."

Regulation § 404.1564 lists four education classifications plus the sometimes overlapping classification of "inability to communicate in English." Those four classifications in ascending order of level of education are: "illiteracy," "marginal education," "limited education," and "high school education and above." The plain language of rule 201.19 therefore conveys the idea that "limited or less" refers to the category of "limited education" and the two lower levels of education—"marginal" and "illiteracy," as well as anything which might conceivably fall between those descriptions. *Cf. Kirk, supra* at 540. The fact that neighboring rule 201.18 refers to an education component of "limited or less—at least literate and able to communicate in English" further supports the proposition that "illiteracy" was intended to be included in the education component of 201.19. If such had not been the intent, the drafters would have used the same language they used in rule 201.18.

Finally, this construction is also in accord with the general pattern of the rules in Table 1 of the grids. As one moves down the table, rule 201.19 markes the beginning of a group of rules assuming a higher level of work experience for individuals of ages 45 through 49. At this point of a higher level of work experience, the thrust of 201.-19 and subsequent rules is to say that all other factors are so favorable to the claimant that she can be declared "not disabled" regardless of her educational background. Thus, the court rejects the idea that the claimant's alleged illiteracy is dispositive of the issue of whether rule 201.19 should apply. Even if the claimant is illiterate, she could still be declared "not disabled" by virtue of 201.19 as long as all other categories accurately describe the situation.

■ Unfortunately for the Secretary, however, the rest of 201.19 does not accurately describe the claimant. Like the age component, the factor of prior work experience assumed by 201.19 is "skilled or semiskilled—skills not transferable." Yet, the ALJ made not one single finding to support the conclusion that the claimant's past

work history fits this category. Cf. 20 C.F.R. §§ 404.1565 and 404.1568. In fact, the ALJ never even really stated a conclusion that the claimant's work experience was best described as semiskilled or better. The closest thing to such a conclusion was two statements which might be seen as implicitly concluding that the claimant had at least "semiskilled" work experience. The first is the statement that use of 201.-19 as a framework was appropriate. The second was as follows: "Based on the claimant's residual functional capacity, the issue of transferability of work skills is not material."

If it can be assumed that the ALJ was reading and interpreting and applying the grids correctly, each of these two statements included the implicit conclusion that the claimant was at least semiskilled. First, use of 201.19 would obviously not be proper unless the claimant had at least semiskilled work experience, since the work experience component of 201.19 is listed as "skilled or semiskilled—skills not transferable." Second, it makes no sense to even be discussing transferability of skills if the relevant person is not even semiskilled. Furthermore, the reference to transferability of skills appears to be an allusion to a possible choice between application of rule 201.19 and 201.20, the only difference between the rules being that the latter lists the work experience component as "skilled or semiskilled—skills transferable" as opposed to "skilled or semiskilled—skills not transferable."

Nevertheless, this court cannot simply make the blanket assumption that the ALJ was reading, interpreting, and applying the grids correctly. First of all, even if the ALJ had made explicit findings of semiskilled work experience, the court is not convinced that it would be able to affirm the findings and the consequential application of rule 201.19. The evidence within the record to support such a finding is so sparse that the court would have to carefully scrutinize any such finding. Absent any such findings, the court certainly cannot uphold application of 201.19 as proper. Indeed, the weak nature of the evidence causes this court to suspect that the rules

were misread because this court finds a conclusion of "unskilled" work experience to be the more natural result of an examination of this record. At the hearing, the ALJ commented that it appeared that the claimant's "only vocationally relevant work experience would be as a housekeeper" at a hospital. Yet, given the claimant's description of this work as delivering ice to patients, cleaning rooms, and carrying laundry, categorization of this work as semiskilled may easily be called into question. Without express findings, the court simply cannot accept this categorization on the blanket assumption that the ALJ made appropriate findings based on the appropriate standards. Without findings, the court has no assurance that the ALJ applied the right standards or even read the rules of the grids correctly. The weakness of the evidence suggests the contrary. Furthermore, other misreadings or oversights in application of the rules as discussed elsewhere in this case also give the court some cause for concern.

Even the statement about transferability of skills not being material is somewhat confusing within the context of this case and the grids themselves. Thus it, too, causes the court to suspect an incorrect reading of the rules. First, as already discussed, the statement assumes that the claimant is at least "semiskilled," yet there was never any such finding. Furthermore, as previously noted, the record might not support such a finding even if made. Nevertheless, even if those problems are ignored, the statement, if taken literally, implies the ALJ's analysis reached a point of deciding between "semiskilled—transferable" and "semiskilled—nontransferable" and "unskilled." Placed within the context of the rules, this translates into a debate between 201.20 and 201.19 rather than a debate between 201.19 and 201.18 or 201.17. If the true debate was the former, the ALJ correctly determined that an answer was not necessary because both rules direct a conclusion of "not disabled." Thus, by applying 201.19 rather than 201.-20, the ALJ would have simply been giving the claimant the benefit of the doubt on the work experience issue. However, given

the state of the record and the lack of discussion by the ALJ, the court possesses substantial doubt concerning whether the ALJ ever reached a point of expressly finding that the claimant must be described by either 201.20 or 201.19. Surely a debate between the standards of 201.19 and 201.18 or 201.17 would have been more likely than a debate between the standards of 201.19 and 201.20. Accordingly, since there is so much room for doubt, the court concludes that the ALJ's failure to make findings of fact concerning the claimant's prior work experience prevents the court from upholding the use of rule 201.19 as a framework for deciding that the claimant is not disabled.

## IV. RULES 201.18 AND 201.17

It could be that the ALJ was actually debating between 201.18 and 201.19. Accordingly, perhaps the ALJ really meant to note that the issue of "skilled" or "unskilled" was irrelevant. The previous work experience of 201.18 is listed as "unskilled or none," yet the rule directs the same result of "not disabled" as does 201.19. Thus, if the ALJ's debate was actually between 201.18 and 201.19, this would explain the ALJ's neglect of the skills issue. If the debate was truly between those two rules, there would not need to be any skills related findings or conclusions because skills are truly irrelevant. The fact that the ALJ engaged in no skills related analysis or findings does suggest that the ALJ was actually debating between 201.18 and 201.19. If the debate was between 201.19 and 201.20, the court cannot imagine why the ALJ did not at least make some basic findings regarding skills, or some explanation of the assumption that the claimant was at least semiskilled.

The role of the literacy issue in this case also suggests that the ALJ may have been deciding between 201.18 and 201.19 in its rejection of 201.17, thus rendering the issue of previous work experience irrelevant. As already noted, the education component of 201.19 is "limited or less." Thus, 201.19 includes the lower educational level of "illiterate." Yet, some of the Secretary's argument before this court seemed to accept

the plaintiff's contention that the issue of illiteracy was critical to the outcome of the case. This would only be true if the debate was between 201.17 and 201.18. Both of these rules are in the grid for "sedentary" work, and both are for individuals of ages 45 through 49 who have an "unskilled or none" work experience. The only difference is the education component and the ultimate conclusions on disability. Rule 201.17, which the plaintiff wishes to apply, lists the education component as "illiterate or unable to communicate in English." Rule 201.18, on the other hand, speaks of a "limited or less [education, but] at least literate and able to communicate in English." Furthermore, this one step increase in education level was enough to render a person "not disabled" who would have otherwise been "disabled" under 201.17.

Since the parties appear to deem literacy as critical to the outcome of this case, and since the court cannot uphold an application of 201.19 because of the lack of findings and evidence concerning previous work experience, the court will for the moment assume that the Secretary is actually arguing for denial of benefits based upon rule 201.18 rather than 201.19.

Obviously the lowest level of work experience assumed in 201.18 poses no obstacle to application of the rule in this case or any other. Furthermore, the age of 45 through 49 obviously applies to the claimant during part of the relevant time as discussed above. Now enter the education component, and the debate between the parties which has raged on throughout the various documents filed in this court finally makes sense. As indicated above, 201.18 assumes that the claimant is at least literate and able to communicate in English. Clearly the claimant does communicate in English as this phrase is defined in regulation § 404.1564(b)(6). The question is whether she is illiterate as defined in § 404.1564(b)(1). Or more accurately, the question is whether substantial evidence within the record supports the conclusion that the claimant is not illiterate. The Secretary argues yes. The plaintiff argues to the contrary and accordingly asserts that

201.17 must apply and that the plaintiff must therefore be deemed disabled.

The definition of illiteracy appears in regulation § 404.1564(b)(1) as follows:

> Illiteracy means the inability read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling.

By way of contrast, the next higher level of education, marginal education, is described as follows:

> Marginal education means ability in reasoning, arithmetic and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education.

Based upon these definitions, a surface glance at the record in this case would clearly support the Secretary's conclusion that the plaintiff's education level is higher than illiteracy. The plaintiff in this case completed the 6th grade and perhaps a little more. Thus, the plaintiff's formal education is at the high end of the marginal education subcategory, which refers to the 6th grade *or less*. It almost appears to qualify the plaintiff for the even higher subcategory of "limited education" which refers to a "7th grade through 11th grade level of formal education." 20 C.F.R. § 404.1564(b)(3). However, the regulations also point out that mere years of formal education is not dispositive. The introductory portion of § 404.1564(b) notes that "the numerical grade level that [a claimant] completed in school may not represent [the claimant's] actual educational abilities," but "if there is no other evidence to contradict it, [the] numerical grade level" will be determinative.

▉ Since there is other evidence in this case, the claimant's completion of six grades of school cannot be dispositive of the educational question. To begin, all parties admit that the plaintiff's numerical grade level overstates her abilities. However, this concession does not settle the

question because marginal education includes "6th grade level or less" down to illiteracy. The question is the degree to which the claimant's 6th grade education overstates her abilities. If she cannot read or write a simple message such as instructions or inventory lists, she must be deemed illiterate regardless of how many years she attended school.

The evidence on literacy consists of testimony at the hearing before the ALJ and of a report by a psychologist. The relevant portion of the psychologist's report stated as follows:

> Mrs. Welchance appears to be able to learn new procedures and acquire new information at a level, which while below average, is sufficient for unskilled work. Apparently she has demonstrated this over the years. Abstract thinking is rather low, but there are many jobs which do not require planning and inferring relationships.
>
> Her basic achievement is rather low in arithmetic, and essentially she can be considered as illiterate, with a reading level at grade 3.7, represented by standard score of only 61, which reading level is below expectations, based upon the intelligence quotient of 72. Arithmetic achievement, while also low, is consistent with her ability level (arithmetic grade 2.7, standard score 76).

The psychologist also discussed her intelligence level in a little more detail, but other than being an explanation for her reading and writing problems, this evidence is actually more relevant to the claimant's ability to perform the full scope of sedentary work, an issue which will be addressed later.

In addition to the psychologist's report, the hearing transcript reveals the following questions and responses:

ALJ: Can you read and write?

Plt: Little bit.

ALJ: Can you read a newspaper?

Plt: (unintelligible response.)

. . . . .

Atty: Okay. Now through the years, have you regularly read newspapers or magazines?

Plt: I've tried to read them.

Atty: Well what do you mean try?

Plt: Well, there's some—I mean I think—I don't know all of the words, and sometimes I have to ask people that—anyone with me what that word is or something.

Atty: Can you get the drift of the newspaper?

Plt: I don't know what you mean, drift.

Atty: Well, can you read it—an article in a newspaper and make sense out of it?

Plt: No, sir, I can't.

. . . . .

Atty: Okay. Have you ever had a job where you had to write anything down, or read instruction books?

Plt: Yes, sir. When I was in the hospital, but I couldn't do it and so they—I have to get this woman, you know, with me, and she wrote it for me. I couldn't do it.

Finally, the entire realm of literacy evidence is completed by the following exchange between plaintiff's attorney and her former husband with whom she once again lives in order to take care of his medical needs:

Atty: Okay. Do you read sir?

Witness: Quite a bit, but I have slacked off quite a bit in the last 3 or 4 years on account of I'm getting a cataract and it aggravates me, sometimes blurs things.

Atty: Was her description of the limitation about her reading accurate?

Witness: Yes, pretty accurate.

Atty: She really just doesn't read, does she?

Witness: No, you have to help her with it.

Atty: Okay. I think that's really all I want.

The help this sum of evidence gives is certainly lacking. Nevertheless, the question for this court is only whether this evidence amounts to substantial evidence that the plaintiff is more than illiterate.

The only published Sixth Circuit opinion with any significant guidance on this issue is *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524 (6th Cir.1981). In *Kirk*, plaintiff Leonard was 49 years old and could not do simple arithmetic. However, he could read and write, but "not too good." The ALJ found that Leonard had a "limited" education, but Leonard argued for a finding of illiteracy. The Sixth Circuit then rejected the applicability of illiteracy on the ground that it did not fit one who "could indeed read and write albeit 'not too good.'" However, the arithmetic limitations also caused the court to reject "marginal education" as not descriptive of the plaintiff's condition. *A fortiori*, it had to reject the "limited education" subcategory also. Accordingly, since "no category perfectly matched [Leonard's] characteristics," the court concluded that "the grid should not have been applied" and consequently remanded the case for further findings of fact.

A few unpublished Sixth Circuit opinions also mention the issue, but only one adds significant value to the present discussion. *Hamblin v. Heckler*, 787 F.2d 590 (6th Cir.1986) (unpublished) involved a 47–year-old disability applicant with a formal education through the third or fourth grade. The record also contained a note from the applicant's treating physician conveying the doctor's "understanding that the [claimant was] basically illiterate." Based on these facts and a reading level evaluated at about second grade level, the claimant argued that he should be considered illiterate. The ALJ rejected this contention, and the Sixth Circuit eventually upheld the finding of at least a marginal education. Specifically, the court noted that the claimant's fifteen years of experience as a welder, and the fact that he was able to learn the requirements of the job in a matter of weeks, indicated that his true educational abilities were higher than that ordinarily present in someone with only a third grade education. Furthermore, the court found significance in the claimant's good "comprehension and communication skills" as evidenced by his performance at the administrative hearing.[1] Finally, the court also deemed it significant that the claimant's reading therapist had noted "tremendous achievement for one semester." *Cf. Webb v. Secretary of Health and Human Services*, 762 F.2d 1013 (6th Cir.1985) (unpublished—court seemed to accept "marginal education" classification of functionally illiterate person with eighth grade education, but significance greatly reduced by the fact that finding of illiteracy was not prerequisite to court's ultimate remand for award of benefits); *Petty v. Bowen*, 860 F.2d 1080 (6th Cir.1988) (unpublished—claimant classified as illiterate and benefits awarded when court determined that claimant was "functionally illiterate" and that tests "afford[ed] no support for a finding that [the claimant] had the ability to read or write a simple message such as instructions or inventory lists); *Sandula v. Secretary of Health and Human Services*, 723 F.2d 911 (6th Cir.1983) (unpublished—claimant with eighth grade education but unable to read and write apparently deemed illiterate); *Jenkins v. Secretary of Health and Human Services*, 746 F.2d 1477 (6th Cir.1984) (person with 6th grade education had "marginal education").

■ Summarized, then, Sixth Circuit case law appears to establish the following propositions. First, a person with a 6th grade education and who can read and write, but not too well, and who also cannot do simple arithmetic, is not illiterate, but likewise does not have a "limited education." Second, a person with a third or fourth grade education and a second grade reading level is not illiterate if he has good learning and comprehension abilities and good communication skills, as well as work experience which can be deemed educationally significant. Third, it is unclear whether "functionally illiterate" is the same thing as "illiterate" for purposes of the

1. In contrast, the present record contains evidence that the claimant had a low comprehension level and had difficulty understanding questions. A Social Security Administration employee noted that questions would have to be repeated for the claimant. Furthermore, it is undisputed that the claimant's intelligence quotient is low.

grid classifications. Nevertheless, it is clear that, as is in accord with the plain language of the regulations, one is illiterate if one cannot read or write a simple message. This is true regardless of how many years the claimant attended school. However, a sixth grade education standing by itself with no evidence reducing its significance, does prevent a claimant from being classified as illiterate.

■ Unfortunately, applying these principles to the case at bar does not resolve the problem. True, the claimant does have a sixth grade education, but other evidence overwhelmingly demonstrates that her true educational ability is less than that ordinarily represented by a sixth grade education. Thus, her years of schooling cannot be grounds for classification as marginally educated. At the same time, the fact that she only reads at a 3.7 grade level is not clear evidence that she should be classified as an illiterate. In *Hamblin,* the claimant could read only at the second grade level, yet he was not illiterate. However, the *Hamblin* plaintiff also had other things going for him which the present plaintiff does not. Therefore, the mere fact that Hamblin was not illiterate does not also necessarily mean that Welchance is not illiterate. Hamblin possessed significant work experience that indicated educational abilities beyond that represented by his grade and reading levels. Welchance does not. Furthermore, Hamblin apparently had a quick learning ability. As will be discussed in more detail later, Welchance does not. Thus, *Hamblin's* relevance to the present case is somewhat limited.

Furthermore, the record is still rather unclear about what the plaintiff's reading and writing abilities really are. Obviously, she cannot read or write "too good," but as *Kirk* demonstrated, that does not mean she is illiterate. Ultimately, the question should come down to whether she can read or write well enough to read or write a simple message such as instructions or inventory lists. Yet the answer to this is not crystal clear from the record. Unfortunately, nothing in the record indicates whether a grade 3.7 level of reading translates into an ability to read simple messages. And the hearing testimony does not shed a great deal of light on the subject either. In response to very leading questions from the plaintiff's attorney, her witness stated that she basically doesn't read and that she has to have help reading. Yet, she apparently reads well enough to get something out of trying to read the newspaper despite the fact that she sometimes has to ask people what a word is, and despite the fact that she denied being able to make sense out of the articles. Furthermore, it must be noted that newspaper articles are more complicated than simple messages such as instructions or inventory lists. Nevertheless, a more compelling point of evidence strongly supports the idea that she cannot read or at least write such simple messages. The plaintiff stated that when she had a job which required some writing, she had to get a fellow worker to do the writing. And judging from the description of the job in general, it is highly unlikely that the writing was very substantial or complicated. To the court, this latter piece of evidence is most significant. Nevertheless, since the standard is not *de novo,* but only a substantial evidence standard, the court will also review precedent from other circuits in order to determine whether the weak evidence of literacy rises to the standard of being substantial.

Two reported cases from other circuits provide significant support to the Secretary's position in this case. In *Glenn v. Secretary of Health and Human Services,* 814 F.2d 387 (7th Cir.1987), the Seventh Circuit upheld a "marginal education" classification for an individual who had completed either the fourth or sixth grade but testified that he could not really read a newspaper or write a letter. Furthermore, in a hearing demonstration, the claimant had substantial difficulty reading a recipe. However, the plaintiff could pick out some of the words in newspaper articles, and he could also write a very brief and simple note. With this evidence on the record, the court noted that the literacy standard was very low and that the question was essentially whether the reading and writing defi-

ciency was so great as to prevent the claimant from obtaining an unskilled job. With the standard thus described, the court also concluded that, while a close question, there was substantial evidence within the record to support the conclusion that the claimant had a marginal education.

The Eighth Circuit also emphasized the low standard of literacy in *Starks v. Bowen,* 873 F.2d 187 (8th Cir.1989). In *Starks,* the court faced a record showing a person with a tenth grade education, but whose reading, math, and spelling abilities tested at the third grade level. The claimant testified that he could "not really" read and write, and that if he were to read a newspaper he would stumble over the words, knowing some, but not a lot. He also testified that he would have trouble reading lists of products and inventories. Other evidence also supported the idea that his reading ability was "not very good" and that he could not read well enough to understand newspapers and job applications. Yet, other evidence suggested only that he had trouble with the big words. With this record, the court accepted that the plaintiff's reading and writing was very poor, but nevertheless held that there was substantial evidence to support a literacy finding. *See also Hagan v. Schweiker,* 717 F.2d 1229 (8th Cir.1983) (upheld finding of literacy where claimant had fifth grade education, could follow diagrams and measurements quite well, and could make things out by picking through the words); *Elzy v. Railroad Retirement Board,* 782 F.2d 1223 (5th Cir.1986) (upheld finding of not functionally illiterate for a person with a ninth grade education who could write a letter and could read *and* write better than other fellow employees).

Obviously *Hagan* and *Glenn* are damaging to the plaintiff's present cause, but two other cases from the Tenth Circuit are helpful. In *Eggleston v. Bowen,* 851 F.2d 1244 (10th Cir.1988), the court rejected an ALJ's finding that a welder with a third-grade education was literate even though academically illiterate. The court seemed to accept that functional literacy was the issue, but concluded that there was no substantial evidence within the record to support the finding that the plaintiff was functionally literate. The only evidence of functional literacy was an inference from the degree of skill required by the plaintiff's former work, but this inference was rebutted by testimony to the effect that other persons always handled the reading and writing tasks which might ordinarily be associated with such work. Furthermore, the plaintiff only tested at a first grade level or less in math, reading, and spelling.

Even more analogous to the case at bar was *Dixon v. Heckler,* 811 F.2d 506 (10th Cir.1987). Like the present plaintiff, Dixon had attended school through the sixth or seventh grade. However, again like the present plaintiff, that grade level overstated the plaintiff's educational abilities. In fact, the general gist of the testimony was roughly equivalent to that in the present case. There was one statement by Dixon that she could "read a little bit and write a little bit." This may be compared to Welchance's indication that she did at least attempt to read newspaper articles on occasion even if her efforts were not especially successful. Nevertheless, like Welchance, Dixon rejected the idea that she could basically understand newspaper articles. And while it appears that Dixon could and would sometimes copy names off of food products onto a grocery list, she still could not really write, and according to testimony from other witnesses, normally someone else would write even the grocery list.

It was this inability to write that especially damaged the Secretary's position in *Dixon.* The court noted that a minimal ability to read *and* write was required by the regulations before a claimant could be deemed literate. The *Dixon* court then concluded that there was no substantial evidence to support the conclusion that the plaintiff could write even if it was conceivable that she could read. Applying this same standard to the case at bar, the court is convinced that there is not substantial evidence in the record to support the conclusion that Welchance is literate. In fact, there is absolutely no evidence that she can

write. The most direct evidence concerning her ability to write is her statement that when writing was required at a former job, a fellow employee would do the writing for her. Additionally, the psychologist's description of the claimant as functionally illiterate is significant. Thus, especially since the burden of proof at this point is upon the Secretary, the court concludes that there is not substantial evidence within the record to support the finding that the plaintiff is literate.

Furthermore, the court believes that the persuasive authority of *Glenn* is weakened by language which indicates the Seventh Circuit was straying too far from the drafter's intent while emphasizing the low standards necessary to meet the description of literacy. This court agrees that it is a pretty low standard, but the *Glenn* court phrased the query in terms of whether the reading and writing deficiency was so great as to prevent the claimant from obtaining an unskilled job. This is clearly wrong. The question, according to the plain language of the regulation, is whether the deficiency is so great that it prevents the claimant from being able to read or write a simple message. Some unskilled jobs do not even require an ability to sign one's name, much less an ability to read or write a simple message. Thus, the question cannot turn on whether it prevents one from obtaining an unskilled job. Furthermore, since *Starks* relied to some extent upon *Glenn*, the persuasive authority for that case is also weakened. Rather, following the lead of the Tenth Circuit and intimations from the Sixth Circuit cases which have already been discussed, this court concludes that the ALJ's determination of literacy must be overturned as not supported by substantial evidence.

 Having determined that the plaintiff must be deemed illiterate, the court must also necessarily conclude that the use of grid rule 201.18 or 201.19 was improper even if used only as a framework for a decision. Instead, rule 201.17 must be applied to the time period after the plaintiff reached age 45. Rule 201.17 applies to individuals of ages 45–49 who are illiterate, who have an unskilled work experience, and who are capable of performing only sedentary work. These four characteristics accurately describe the plaintiff after she turned 45 in October of 1987. Accordingly, since rule 201.17 dictates a conclusion of "disabled," the plaintiff must at the very least be considered disabled as of October 1987.

## V. RULE 201.23

Having determined that substantial evidence within the record supports no other conclusion than that the plaintiff is illiterate and has an unskilled work experience, rule 201.23 must be the focus of analysis for the period when the plaintiff was under 45 years of age. Rule 201.23 directs a conclusion of "not disabled" for illiterate persons who are capable of sedentary work, have unskilled work experience, and are under 45 years of age. In fact, all grid rules applicable to persons under age 45 direct a conclusion of "not disabled." However, as noted earlier, the grids cannot be applied to dictate a conclusion if they do not precisely describe a claimant. Furthermore, their usefulness as a guide or framework for a decision also declines in proportion to the degree which the rule departs from an accurate description of the plaintiff. Thus, the question for the court at this point is whether substantial evidence in the record would support the use of any grid rule as a framework for deciding that the claimant was not disabled prior to October 1987.

Since illiteracy and unskilled are the lowest levels of education and work experience, the plaintiff can certainly not complain that those subcategories of rule 201.-23 do not accurately describe her abilities or condition. Likewise, there can be no dispute that prior to October 1987, the plaintiff fell into rule 201.23's age description of "younger individual" age 18–44. The only real question concerns the claimant's ability to perform a full range of sedentary work.

In this case, the ALJ recognized that the claimant's low intelligence level was a nonexertional impairment not considered by

the grids. Thus, the ALJ did not attempt to say that the grids precisely described the claimant's condition and therefore dictated a conclusion of "not disabled." Rather, the ALJ found that "[t]he claimant's nonexertional impairments do not significantly compromise her residual functional capacity for sedentary work." Thus, he concluded that the grids could be used as a framework, and accordingly concluded that the plaintiff was "not disabled."

■ The court concludes that the ALJ failed to give appropriate consideration to the plaintiff's intelligence or learning problems. To support his conclusion that "the claimant's non-physical impairments [do not] compromise her ability to perform sedentary work," the ALJ noted that "the claimant had earlier engaged in substantial gainful activity despite her borderline intelligence." This manner of reasoning is improper. In order for use of a grid rule as a framework to be proper, the claimant must be capable of performing a wide range of work at the work level described by the grid. The mere fact that a claimant's intelligence problems did not prevent her from working at some point in time in no way demonstrates that those same intelligence problems would not prevent her from performing a wide range of work, let alone a wide range of work at a physical level more reduced than that of which the claimant was capable at the time of the previous work. The same type of reasoning would mean that a stable mental impairment is always irrelevant to someone who had at one time worked while having that mental impairment.

■ The problem with this reasoning is also demonstrated by the basic idea behind disability determinations and the use of the grids. The question for someone who can no longer perform her past work is whether she can perform work which exists in significant numbers within the national economy. The question is not whether there is some job, somewhere, which the plaintiff would be capable of performing. In accordance with this fact,

the grids are simply statistically based generalizations that significant jobs are available in the national economy for those who are accurately described by a rule which directs a conclusion of "not disabled." Logically then, the rule cannot be presumed to show that significant jobs are available within the national economy for a person who cannot perform a wide range of work at the level assumed by the rule.

■ In this case, the ALJ found that the claimant's physical impairments limited her to sedentary work. The uncontroverted evidence also shows that the plaintiff has an intelligence level "at the lower end of the Borderline Intellectual Functioning level." In fact, her full-scale intelligence quotient places her at the third percentile. Furthermore, verbal and performance scale I.Q. testing resulted in similar scores. The same psychological report also noted that the plaintiff's "[a]bstract thinking is rather low." Likewise, ability to learn new procedures and acquire new information was ranked as below average. And while this disability was not deemed so severe as to prevent the performance of any unskilled work, the fact that she might be capable of some unskilled work still does not demonstrate that she is capable of performing a wide range of sedentary work. Accordingly, the court concludes that use of rule 201.23, or any other rule for individuals under age 45, would have been inappropriate as not adequately considering the plaintiff's nonexertional limitations.[2]

This conclusion is also strongly supported by a footnote to rule 201.23 and all subsequent rules in the sedentary work level grid. That footnote makes reference to regulation 201.00(h) which states as follows:

[A]ge is a more positive factor for those who are under age 45 and is usually not a significant factor in limiting such an individual's ability to make a vocational adjustment, even an adjustment to unskilled sedentary work, and even where the individual is illiterate or unable to

---

**2.** This same principle would preclude application of rules 201.18 or 201.19 for the period

after October 1987 even if the plaintiff possessed an educational ability above "illiterate."

communicate in English. However, a finding of disabled is not precluded for those individuals under age 45 who do not meet all of the criteria of a specific rule and who do not have the ability to perform a full range of sedentary work. The following examples are illustrative.... Example 2: An illiterate 41 year old individual with mild mental retardation (IQ of 78) is restricted to unskilled sedentary work and cannot perform vocationally relevant past work, which had consisted of unskilled agricultural field work; his or her particular characteristics do not specifically meet any of the rules in Appendix 2, because this individual cannot perform the full range of work defined as sedentary. In light of the adverse factors which further narrow the range of sedentary work for which this individual is qualified, a finding of disabled is appropriate.

 This regulation and the example included therein clearly indicate that a limited intelligence is a significant limitation upon a person's ability to perform a wide range of a certain category of work. Furthermore, the present claimant is even worse off than the "disabled" person described in the example. Thus, this court must conclude that the plaintiff is disabled and should therefore be awarded benefits. It may be that this regulation does not mandate a conclusion of "disabled" for every person with limited intelligence who is otherwise accurately described by rule 201.23, but at the very least strong evidence from a vocational expert would be required to show that the claimant could perform substantial gainful activity which existed in significant numbers within the national economy. Given the severity of the plaintiff's intelligence limitations in this case, and given the fact that the Secretary offered no vocational testimony despite having the burden of proof at this step in the evaluation process, this court concludes

that remand for further findings is not appropriate. Accordingly, this case is simply remanded for an award of Title II benefits for that period of time not precluded by the final decisions upon other applications. *Cf. Hamblin, supra.* Furthermore, the plaintiff must also be deemed disabled for the purpose of Title XVI benefits, and benefits should be awarded on remand if otherwise appropriate under the law.

An appropriate order will be entered.

## ORDER

In accordance with the memorandum contemporaneously filed, the defendant's motion for summary judgment is hereby denied. To the extent that the plaintiff's motion for summary judgment is in harmony with the memorandum opinion, said motion is granted. This case is remanded to the Secretary for an award of Title II benefits for that period of time not precluded by the final decisions upon other applications. Furthermore, this case is remanded for an award of Title XVI benefits, if otherwise appropriate under the law.

## REPORT AND RECOMMENDATION

WILLIAM J. HAYNES, Jr., United States Magistrate.

### I. INTRODUCTION

This civil action was filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Secretary of the Department of Health and Human Services (hereinafter referred to as "the Secretary"), that plaintiff is not entitled to disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act (hereinafter "the Act"). Plaintiff applied for both benefits on June 12, 1985 (Transcript [tr.] 91–94, 119–128), but her applications were denied initially and upon reconsideration (tr. 95–99, 129–138).[1]

---

1. Plaintiff's three previous applications for disability insurance benefits filed September 22, 1982 (tr. 65–68); April 18, 1983 (tr. 73–76); and July 25, 1983 (tr. 82–83, 106–115), respectively, were denied at the initial level and plaintiff did not pursue available remedies at the administra-

tive level or judicial level. Thus, as the Secretary correctly submits, the court has no jurisdiction to review the actions of the Secretary on the earlier claims in the absence of a colorable constitutional claim when the prior decision is not reopened. *Califano v. Sanders,* 430 U.S. 99,

An evidentiary hearing was held before the Administrative Law Judge (ALJ) on April 14, 1986 (tr. 40–64). On July 29, 1986, the ALJ issued his finding that the plaintiff was not entitled to disability insurance benefits (tr. 12–19). After considering the plaintiff's age of forty-three (43) the plaintiff's sixth grade education and her residual functional capacity to do light work, the ALJ applied the grid under 20 C.F.R. Section 404.1569 and Rule 202.07, Table No. 2 of Appendix 2, Subpart P, Regulations No. 4, and concluded that the plaintiff was not disabled. *Id.* at 19.

In summary, the ALJ made the following findings. Plaintiff met the disability insured status requirements of the Act on January 31, 1980, the date the plaintiff stated she became unable to work, and continued to meet them through September 30, 1984, but not thereafter. The plaintiff had not engaged in substantial gainful activity since January 31, 1980. Plaintiff had severe degenerative disc disease of the lumbo sacral spine, status post bypass surgery for occlusive vascular disease of both legs, and had a history of recurrent GI disease. The plaintiff had borderline intellectual functioning and there was evidence consistent with brain dysfunction. However, the plaintiff did not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

The ALJ also noted that plaintiff's subjective complaints, including pain, were disproportionate to the reported objective clinical findings. The plaintiff's physical impairments restricted her to light work within the regulatory definition. (20 C.F.R. §§ 404.1545 and 416.945), but the plaintiff was unable to perform her past relevant work as a nurse's aide. The plaintiff, who was 43 years old, is defined a younger individual under 20 C.F.R. §§ 404.1563 and 416.963). The plaintiff has a limited (sixth grade) education and based upon the plaintiff's residual functional capacity, the transferability of her work skills was not material. However, the plaintiff's nonexer-

tional impairments did not significantly compromise her residual functional capacity for light work.

Accordingly, the ALJ applied the grid under section 404.1569 of Regulations No. 4 and section 416.969 of Regulations No. 16, and using Rule 202.07 of Table No. 2, Appendix 2, Subpart P, Regulations No. 4 as a framework for decision making with consideration of the vocational factors, concluded the plaintiff was "not disabled." (tr. 19) On September 4, 1986 the plaintiff petitioned Appeals Council for review and submitted an additional medical report. The Appeals Council denied plaintiff's request for review and issued its decision on October 22, 1986 (tr. 6–7) affirming the ALJ's findings.

This action was filed timely on January 29, 1987. On September 30, 1987 the Honorable L. Clure Morton, Senior Judge remanded this action to the Administrative Law Judge so as to allow the Secretary to redetermine this claim under the guidelines in *Samuels v. Heckler*, 668 F.Supp. 656 (W.D.Tenn.1986), if the plaintiff so elected (Docket Entry Nos. 4 and 15). On November 25, 1987, the ALJ reissued another decision after a reevaluation under to *Samuels* principles. The ALJ findings were essentially the same as his July, 1986 findings, except that the ALJ now found that the plaintiff's physical impairments restricted her to sedentary work. The ALJ then applied the Grid in accordance with section 404.1569 of Regulations No. 4 and section 416.969 of Regulations No. 16, and using Rule 201.19 of Table No. 1, Appendix 2, Subpart P, Regulations No. 4 as a framework for his decision on the vocational factors, and concluded the plaintiff was "not disabled."

On January 20, 1988, the Appeals Council concluded that further proceedings were required before a final decision because the ALJ had not afforded plaintiff and her counsel an opportunity to submit comments on additional records that the ALJ had

107–08, 97 S.Ct. 980, 985, 51 L.Ed.2d 192 (1977); *Bagby v. Harris,* 650 F.2d 836, 838–39 (6th Cir.

1981).

received (tr. 436). Thus, the Appeals Council remanded the action to the ALJ for that purpose. *Id.*

On March 7, 1988, after comments were obtained from the plaintiff and her counsel relative to Exhibits 89 through 91 and their additional comments (tr. 313–323), the ALJ issued his recommendation and again concluded that there was nothing in these comments to warrant a change in his earlier decision of November 27, 1987 wherein he concluded that the plaintiff was not disabled. On March 14, 1988, the Appeals Council adopted the ALJ's findings and conclusions that the plaintiff was not disabled. (tr. 310–311).

This civil action was reopened on April 15, 1988 upon completion of these remand proceedings (Docket Entry No. 21). On May 13, 1988, the plaintiff moved to remand this action to the Appeals Council for its failure to consider the plaintiff's counsel's comments prior to its ruling on the ALJ's recommended decision (Docket Entry No. 22). On May 19, 1988, Judge Morton granted plaintiff's request. On May 27, 1988, after receipt of counsel objections and comments, the Appeals Council issued its decision that adopted the ALJ's recommended decision (tr. 443–44). The proceedings here are reviewed (tr. 28).

On January 12, 1989, the plaintiff moved for summary judgment upon the ground that the record reveals the Secretary's decision is not supported by substantial evidence (Docket Entry No. 37). The Secretary has also moved for summary judgment on the bases that its decision is supported by substantial evidence (Docket Entry No. 42). If supported by substantial evidence, the ALJ's and Appeals Council's findings are conclusive. 42 U.S.C. § 405(g).

As noted earlier, plaintiff's insured status expired on September 30, 1984 (tr. 139). Therefore, to establish disability, plaintiff must prove disability under Title II of the Act prior to September 30, 1984. Thus, the relevant facts on disability under Title II

are medical records prior to or on September 30, 1984. To establish entitlements to supplemental security income under Title XVI after the expiration of plaintiff's insured status under Title II, plaintiff is required to establish that her condition resulted in a functional disability for at least 12 months.

## II. REVIEW OF THE RECORD

At the time of the April 14, 1986 hearing before the ALJ, Dorothy Welchance (hereinafter Welchance) was a 43–year–old divorcee living in Woodbury, Tennessee, with her ex-husband (tr. 39, 331). Welchance has a sixth grade education and can read a "little bit" (tr. 331). Welchance does not possess a drivers license,[2] but she drives her ex-husband to the doctor and visits her mother (tr. 339). On the average, Welchance drives approximately twenty miles per week. *Id.* Welchance was last employed in 1978 as a nursing aide for six months at a nursing home. Prior to that time Welchance was employed at Good Samaritan Hospital (tr. 332–33) as a nursing aide from 1965 to 1970 and a housekeeper from 1970 to 1976.

As a nursing assistant, Welchance, along with a co-worker, removed patients from their beds in order to bathe and shower patients (tr. 334). Welchance was walking six hours a day, standing one hour, *Id.* and sitting about fifteen minutes (tr. 193). Welchance was frequently bending. *Id.*

As a housekeeper, Welchance distributed ice to patients, sanitized the beds once patients were discharged, mopped floors, cleaned bathrooms and carried laundry (tr. 333). The heaviest item that she lifted weighed about thirty pounds (tr. 334)

Welchance testified that she is unable to work due to pain in the lower part of her back and hips (tr. 339). According to Welchance, she is in pain "seems like all the time". Welchance had problems with her legs and hips. Welchance described the pain as follows: "It just seems like my hips

---

**2.** This lack of a driver's license is unclear, because at the hearing, Welchance testified that she has no restrictions on her drivers license.

just freeze up or something, and then it, it just feels like you're taking a butcher knife or something and just cutting into them. And then my legs—it just feels like the muscles, you just tie them in a knot" (tr. 343). Welchance has been advised to exercise two or three times daily for her back but she has only been able to do it once a day because the pain hurts.

As to gastritis, Welchance testified that she is prescribed medication for the gastritis and if she does not take the medication, then her stomach aches (tr. 344). However, Welchance concedes that when she takes the medication, her stomach ailment is controlled.

On a daily basis, Welchance lies on the couch expending eight hours a day watching television (tr. 341). She attempts to perform general housekeeping such as sweeping and mopping but it takes several hours for her to perform such tasks. Welchance sleeps approximately four hours a night and does not nap during the day (tr. 342). Welchance testified that she is unable to sit for long periods without becoming uncomfortable. *Id.* On the average, Welchance sits about thirty minutes and then must move around. Welchance can stand for approximately thirty minutes. *Id.* Welchance testified that it was difficult for her to go to the store to get groceries because of the pain in her legs and hips, but she managed to complete the task (tr. 343).

Finally, Welchance testified that she is unable to work in a nursing home because she could not lift patients (tr. 345). Further, she is unable to perform any tasks such as writing that a job may require. *Id.* While employed as a nursing assistant, Welchance states that another co-worker performed the required writing.

Edward Luther Welchance, Welchance's former husband testified (tr. 348). Welchance testified that her ex-spouse who has a respiratory problem is at present living with her and she is taking care of him. Welchance has to lift him. *Id.* Mr. Welchance testified that the plaintiff had problems walking to the ALJ's office (tr. 349). Welchance attempted to return to work for two to three days in 1983 and had to quit due to her back impairment. *Id.*

There are unidentified office notes in the record that reveal that during this period, October 13, 1980 through July 1, 1982, Welchance was treated for *inter alia,* back distress. Specifically, on January 16, 1981, Welchance complained of "bilateral lumbo sacral pains with equivocal radiation to right and left buttocks as well as posterior thighs" (tr. 219). In July, 1981, Welchance continued to experience recurrent low back pain, but her back was observed "grossly normal" (tr. 218). Welchance was advised to lose weight and was begun on a lumbo sacral corset (tr. 217). Welchance was advised to use Tylenol sparingly for the backache. In April of 1982, Welchance continued to have low back distress (tr. 214).

Welchance's progress file from the Mansfield General Hospital in Mansfield Ohio (tr. 209–222), dated May 21, 1981 reveal that Welchance complained of intermittent epigastric bloating and gaseous fullness (tr. 221). In August of 1981, Welchance underwent an excision of xanthelamsa of both the upper and lower eyelid (tr. 211).

Office notes of Leon Reuhland from the period September 10, 1980 to May 28, 1985, reveal Welchance was seen on numerous occasions for back pain (tr. 272–282). On September 10, 1980, Welchance complained of low back pain and pain in her hips (tr. 282).

On September 10, 1981, Welchance visited Dr. Reuhland with complaints of back pain. *Id.* On September 22, 1982, Welchance visited Dr. Reuhland complaining of back pain and pain on her right side. On each occasion, Welchance was prescribed medication (tr. 281). In August, 1982, Welchance visited Dr. Reuhland for pain in her back, right leg and side (tr. 281). In August of 1982, Welchance reported that she was tender along the spine (tr. 280). In October, 1982, Welchance was administered pain medication for her back.

On September 29, 1982, Dr. Tom Johns, an orthopedic surgeon examined Welchance for low back pain (tr. 222). X-rays revealed L4–L5 osteophytes and narrow disc lateral

x-rays show L3–L4 disc osteophytes. Dr. Johns reported a diagnosis of "mechanical low back pain." *Id.* Dr. Johns recommended exercise and pain medication. Welchance returned approximately two weeks later. Pain still persisted in the midline L5–S1 area. *Id.* However, Welchance reported she was improved a little.

On October 17, 1982, Dr. Leon L. Reuhland reported that Welchance had been in his office on four occasions for *inter alia*, sinusitis, arthritis on September 10, 1981; viral labrynthritis and arthritis with spasm of back on June 4, 1982; dermatitis and osteoarthritis on August 2, 1982; and osteoarthritis with probable disc disease and right ovarian cyst on September 22, 1981 (tr. 224).

On February 11, 1983, Welchance returned to Dr. Reuhland with continued back pain (tr. 279). On March 2, 1983, Welchance reported low back pain (tr. 278). On April 19, 1983, Dr. Reuhland noted in his progress reports that Welchance was still experiencing back pain (tr. 277) from neck down to lower part of back. Welchance also complained of her stomach hurting. *Id.* In September, 1983, Welchance required medication for her nerves (tr. 279). On January 29, 1984, Welchance complained of shoulder pain (tr. 275). In July, 1984, Welchance complained of pain in the rib under her breast (tr. 274). Further, in April of 1984, Welchance complained of severe pain in her lower back. Subsequent, on August 22, 1984, Welchance reported stomach pains (tr. 274).

On March 13, 1983, Welchance was admitted to Stones River Hospital for a rectal lesion (tr. 226). On March 15, 1983, treatment was conducted by Dr. Herbert Wolf. Other laboratory tests revealed an EKG with normal limits. *Id.* A chest x-ray showed minimal cardiomegaly. *Id.* On April 29, 1983, Dr. Wolf reported that he had seen Welchance on October 21, 1982, February 23, 1983, March 2, 1983, and from March 13, 1983 to March 15, 1983 for abdominal pain ulcer, hemorrhoid, back pain, and for an anal fissure (tr. 232).

On June 7, 1983, Dr. William Gavigan, an orthopedic surgeon, reported to the DDS that he conducted an orthopedic examination on Welchance on May 19, 1983 (tr. 237). Dr. Gavigan observed that Welchance walked with a normal gait; her back was limited to sixty degrees forward bending with zero degrees extension. Dr. Gavigan observed that "X-rays of the lumbo sacral spine show straightening of the lumbar curve. There is moderate to advanced anterior osteophytes L3–4 with narrowing of this disc space noted. Also some moderate lateral osteophytes noted at the L4–5 level on the left." *Id.* at 237. Dr. Gavigan diagnosed Welchance's conditions as "1) Degenerative disc disease lumbo sacral spine [and] 2) Possible right lumbar nerve root compression versus irritation." Further, he noted that:

> She has evidence of muscle atrophy in the right leg and a mildly positive right straight leg raising test. She has about 70 to 75% of normal forward bending. This can all be related to spur formation of her degenerative arthritis. There is also a remote chance of a disc protrusion causing the leg symptoms. Her condition causes impairment.

*Id.* at 23.

The medical records of Dr. James Nunnery reveal that in October, 1984, Welchance was admitted for a three day hospital stay for vascular surgery construction (tr. 417). At that time, Welchance continued to complain of low back pain. On December 17, 1984, Dr. Nunnery *reported* that for over a year, Welchance had claudication of both lower extremities from her hips down after walking approximately one block (tr. 270). Dr. Nunnery diagnosed her as having arteriosclerotic occlusive vascular disease of the aortoiliac and recommended an arteriogram. *Id.* On January 8, 1985, Dr. Nunnery reported that Welchance was hospitalized due to pain in both hips and her calves for an arterial work-up. Welchance underwent an arteriogram on January 8, 1985 that revealed an aortoiliac occlusive disease with complete occlusion of the right iliac artery and partial occlusion of the left iliac artery. An aortobifemoral bypass graft was recommended (tr. 252). On January 21, 1985, Welchance un-

derwent an aortobifemoral bypass graft following which her pedis pulses were palable and she was discharged with the "wound healing nicely" (tr. 254).

In November, 1984, Dr. Reuhland stated that Welchance required surgery on both legs (tr. 273). On April 16, 1985, Dr. Reuhland noted in his progress notes that Welchance had severe pain in lower back. At this time, Welchance had been working lifting patients. *Id.* On May 13, 1985, again, Welchance reported that her back was hurting. *Id.* On May 25, 1985, Dr. Reuhland reported that straight leg raising was 45 degrees and he noted that Welchance was a candidate for vocation retraining. *Id.*

On November 26, 1984, Dr. George Hester, an internal medicine specialist performed an examination of Welchance for evaluation of eligibility for services under the Department of Vocational Rehabilitation (tr. 249–250, 402–405). Dr. Hester's diagnosis was arteriosclerotic occlusive vascular disease of the lower extremities and occult blood in the stools (tr. 404). Dr. Hester recommended referral elsewhere to determine Welchance's gastrointestional evaluation. *Id.*

On December 18, 1984, Dr. Tom Johns reported to the Vocational Rehabilitation, Division of Rehabilitation Services, that Welchance had been followed by him for over two years "for significant degenerative joint disease of her lumbar sacral spine with persistent mechanical low-back pain." Further, Dr. Johns reported:

Of more recent and more urgent concern, while carrying out her physical examination it was discovered that she had markedly reduced peripheral pulses in bilateral lower extremities.

 \* \* \* \* \* \*

My major concern is whether the patient could carry on normal or reasonable employment would be related primarily to her degree of peripheral vascular disease.

(tr. 297.)

On June 28, 1985, Dr. William F. Meacham reported to the Disability Determination Section that he had examined Welchance on June 6, 1985 because of a "low back syndrome with mild sciatic nerve root symptoms that suggested a lumbar disc herniation." According to Dr. Meacham, "[he] did not feel surgery was necessary and suggested that [Welchance] be treated conservatively with flexion exercises." Dr. Meacham noted that "[he] had no indication of the effectiveness of the therapy since he [had] not seen her on any other subsequent occasions." (tr. 283.)

On July 9, 1985, Dr. Frank Perry performed a consultative exam for Welchance. He reported that Welchance "had full range of motion of all joints and extremities except for the lumbo sacral spine" (tr. 286). "The dorsalis pedis pulses were intact bilaterally." *Id.* "Posterior tibial pulses were not well-appreciated. There was no peripheral clubbing, cyanosis or edema present." *Id.* "Deep tendon reflexes were all equal except the left ankle jerk was not absent. There was no evidence of muscle wasting present. Heel to toe maneuver was normal bilaterally." *Id.* As to her back, x-rays of the lumbar spine revealed osteoarthritis present. Dr. Perry's final impressions were "low Back Pain with Osteoarthritis and Spondylolithesis and Absent Left Ankle Jerk" and "Status Post Peripheral Vascular Surgery Currently Without Claudication and Good Foot Pulses Present." (tr. 286–287).

On August 19, 1987, Dr. William F. Meacham completed a medical assessment to do work related activities. Dr. Meacham stated that he had not seen Welchance since 1985 and during that time he saw Welchance only once for degenerative disc disorder (tr. 409). Occasionally in 1985, Welchance had pain on standing and walking (tr. 407). Welchance's ability to sit was not affected by her impairment (tr. 408); Welchance could occasionally perform postural activities such as climbing, balancing, stooping, crouching and kneeling (tr. 408). Welchance's ability to reach, handle, feel, push, see, hear, and speak were not affected by the impairments. Dr. Meacham concluded that Welchance's ability to lift and carry affected only the lifting of heavy

objects and Welchance could lift five to ten pounds.

Dr. Bruce A. Davis, Medical Director for Corporate Services, performed a consultative examination on October 27, 1987, at the request of the Disability Determination Section (tr. 384). Welchance's physical examination revealed Welchance at 5'6" weighed 213 pounds. Welchance had "full range of motion at the back, hips and legs with normal gaits." The laboratory data revealed mild left ventricular configuration without enlargement, degenerative changes of the lumbar spine x-rays, and satisfactory pulmonary function studies. Dr. Davis' impression was that Welchance was (1) obese, (2) had degenerative arthritis with chronic low back pain without clinical limitations, (3) aorto-iliac disease, s/p bilateral aortofemoral bypass grafts without clinical limitations; and (4) cigarette abuse. Dr. Davis concluded that Welchance's weight and back condition would limit lifting, pushing, and pulling over ten to twenty pounds as well as frequent bending, squatting, or prolonged sitting, standing, or walking, climbing or crawling (tr. 385).

Dr. Davis also completed a medical assessment to do work-related activities. He determined that Welchance could lift a maximum of twenty pounds for one-third of an eight hour day and frequently lift from one-third to two-thirds of an eight hour day; and could lift ten pounds from one-third to two-thirds of an eight hour day due to her degenerative back disease (tr. 392).

As to walking, Welchance could walk at total of four to six hours a day and without interruption one to two hours daily due to her back problem and the peripheral vascular leg disease. Welchance could sit a total of four to six hours and one to two hours without interruption (tr. 393). Dr. Davis opined that Welchance could occasionally climb, balance, stoop, crouch, and kneel (tr. 393); Welchance had no problems reaching, handling, feeling, seeing, hearing, and speaking. *Id.* There were no environmental restrictions. *Id.*

A vocational specialist comments report dated June 15, 1983, notes that Welchance, who has a seventh grade education with past work experience as a home attendant and cleaner in a hospital, had the residual functional capacity to do light work with occasional climbing. Though Welchance could not do her past work, Welchance could do other work such as key cutter, machine cleaner and turner.

The medical evidence also includes the results of a psychological evaluation performed by Dr. Eugene Witt on May 6, 1983. Dr. Witt reported a Wechsler Adult Intelligence Scale–Revised, revealed a verbal scale I.Q. of 70; performance scale I.Q. of 76 and full scale I.Q. of 72. The Wide Range Achievement Test revealed reading at 3.7, and arithmetic at 2.7 levels (tr. 234). In particular, Dr. Witt opined that Welchance's "basic achievement is low in arithmetic and essentially she can be considered as illiterate. Welchance's reading level was below expectations based upon the intelligence quotient of 72. Dr. Witt observed that Welchance's Bender Gestalt drawings were characterized by distortions which are seen in brain damaged individuals (tr. 235). A Rorschach Test administered to assess personality characteristics revealed anxiety and underlying anger. *Id.* Dr. Witt's impression was" "psychological factors affecting physical condition; borderline intellectual functioning; trend toward an organic brain syndrome, with unmistakable psychological test performance consistent with brain dysfunction" (tr. 235).

## III. CONCLUSIONS OF LAW

Judicial review of the Secretary's decision is limited to the written record made in the administrative hearing process. The determination of disability under the Act is an administrative decision, and the only question before the Court is whether the decision of the Secretary is supported by substantial evidence. Substantial evidence means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. It is more than a scintilla. *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *LeMaster v. Weinberger,* 533 F.2d 337 (6th Cir.1976).

Under *Ragan v. Finch,* 435 F.2d 239 (6th Cir.1970), *cert. denied* 402 U.S. 986, 91 S.Ct. 1685, 29 L.Ed.2d 152 (1971), the plaintiff is deemed disabled under the Act if he were unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or to last at least twelve (12) months. Substantial gainful activity includes not only previous work performed by the plaintiff, but also consideration of plaintiff's age, education and work experience, as well as any other work which exists in the national economy in significant numbers. This latter factor is considered regardless of whether such work exists in the immediate area in which plaintiff resides, or whether a specific job vacancy exists or whether the plaintiff would be hired, if applied. *Id.* The burden of establishing disability is on the plaintiff, and any impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *Id.* In addition to the fact of impairment as defined in the Act and the regulations under the Act, the plaintiff must prove that such impairment is severe enough to preclude him from engaging in any substantial gainful employment activity. *Ragan v. Finch,* 435 F.2d at 241.

■ In reviewing the decision of the Secretary, Courts consider four types of evidence: (1) objective medical findings on the plaintiff's condition; (2) the diagnoses and opinions of medical experts; (3) subjective evidence of plaintiff's condition; and (4) plaintiff's age, education, and work experience. *Miracle v. Celebrezze,* 351 F.2d 361 (6th Cir.1965). The Court must accept the ALJ's explicit findings and determination unless the record, as a whole, is without substantial evidence to support the ALJ determination. *Hephner v. Mathews,* 574 F.2d 359 (6th Cir.1978); *LeMaster v. Weinberger,* 533 F.2d 337 (6th Cir.1976).

The Secretary has prescribed a five step sequential review for processing applications for benefits. See, 20 C.F.R. § 404.1520 (1985). The regulations require the following:

1. First, an initial determination must be made as to whether the claimant is currently engaged in substantial activity, if so, the claimant is found not disabled.

2. Second, the Secretary must determine if the claimant has a severe impairment, one that significantly limits the ability to perform work related functions. If not, then on the medical evidence alone the claimant is determined to be not disabled.

3. Third, if a severe impairment is found, the impairment is compared against those listed in Appendix 1, 20 C.F.R. Subpart P, § 404 (1985), to see if on the medical evidence alone, the claimant can be found disabled.

4. Fourth, if the claimant is not found disabled by reference to Appendix 1, the fourth step requires inquiry into whether claimant can perform past relevant work; if so, the claimant is not disabled.

5. The Secretary will apply the medical vocational tables, Appendix 2, 20 C.F.R. Subpart P, § 404 (1985) to determine whether the claimant can perform any substantial gainful activity in the national economy, i.e., sedentary, light or medium; if not, then the claimant can be found disabled.[3]

Here, the ALJ applied the grid and concluded that Welchance had not engaged in substantial gainful activity since January 31, 1980; while Welchance had severe impairments, none met the listings in Appendix 1; Welchance could not do her past relevant work, but Welchance could do oth-

---

**3.** It should be noted that the Court of Appeals for the Sixth Circuit has emphasized that the "grids" are only to be used when they precisely fill a claimant's situation. *Kirk v. Secretary,* 667 F.2d 524, 529 (6th Cir.1981), *cert denied,* 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983).

*See also, Heckler v. Campbell,* 461 U.S. 458, 463, n. 5, 103 S.Ct. 1952, 1955, n. 5, 76 L.Ed.2d 66 (1983) indicating that the Secretary may rely on the "grid" where they describe a claimant's abilities and limitations accurately.

er sedentary[4] work. Hence, the ALJ applied the medical vocational tables. The task for the Magistrate is whether there is substantial evidence to support the ALJ's decision.

It is well settled that once a claimant presents a *prima facie* case of total and permanent disability for his usual work, the burden of proof shifts to the Secretary to establish that the claimant retains the residual capacity to perform "substantial gainful work which exists in the national economy." *Cole v. Secretary of Health & Human Services,* 820 F.2d 768, 771 (6th Cir.1987); *Noe v. Weinberger,* 512 F.2d 588 (6th Cir.1975). *See also, Hephner v. Mathews,* 574 F.2d 359 (6th Cir.1978); *Montgomery v. Weinberger,* 514 F.2d 1211 (6th Cir. 1975). The Secretary must make a finding, based upon substantial evidence, that the claimant has the vocational qualifications to perform specific jobs. *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984) (*per curiam*); *O'Banner v. Secretary of H.H.S.,* 587 F.2d 321 (6th Cir.1978).

The Court of Appeals explained the Secretary's burden of proof on this issue as follows:

> The sustaining of the Government's burden would appear to require more than a generalized finding of the existence of light or sedentary work in the national economy. While a *per se* rule requiring the presence of a vocational expert does not appear required, a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs does. *Taylor v. Weinberger,* 512 F.2d 664, 668 (6th Cir.1975). The scope of the review requires that there be something more than the mere intuition or conjecture by the administrative law judge.
>
> The preferred method is testimony by a vocational expert which may be considered in conjunction with specific medical testimony. The administrative law judge may thereupon evaluate the vocational capacity of a claimant to perform the available jobs and, perhaps more importantly, a reviewing court can thereafter determine the existence or nonexistence of substantial evidence in support of his determination.

*O'Banner v. Secretary,* 587 F.2d at 323.

At first blush, earlier decisions appear to require vocational testimony. However, in *O'Banner,* the Court approved the ALJ's method of taking administrative notice of the existence of light work in the national economy in lieu of vocational expert testimony. The Court observed that the ALJ interrogated the plaintiff and determined from his answers and from the medical testimony that the plaintiff was capable of performing work of a sedentary nature which was then available in the national economy.

In more recent decisions, the Court of Appeals for the Sixth Circuit has determined that the Secretary may meet this burden by reference to the medical vocational guidelines (the "grids") unless the claimant suffers from a nonexertional limitation that significantly limits the range of work permitted by his exertional limitations. *Cole v. Secretary of Health & Human Services,* 820 F.2d 768, 771 (6th Cir. 1987) citing *Damron v. Secretary of Health & Human Services,* 778 F.2d 279, 281–82 (6th Cir.1985).

In *Kirk v. Secretary of Health & Human Services,* 667 F.2d 524 (6th Cir.1981), *cert denied,* 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) the Court of Appeals discussed the role of grids:

> The courts that have confronted this issue have split widely over the Secretary's ability to carry the burden of demonstrating the availability of jobs, without use of a vocational expert, by relying on the guidelines. In *Boyce v. Harris,*

---

**4.** Under the Secretary's regulation, "sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

492 F.Supp. 751 (D.S.C.1980), the court noted that one of the purposes of the guidelines was to dispense with the necessity of hearing from a vocational expert for often their testimony conflicted and was always time consuming. "The underlying rationale of [pre-grid cases requiring expert testimony] seems to have been made obsolete by the new Vocational Factors Regulations...." *Id.* at 751. Expert testimony would be duplicative of the information contained in the grid. It should be emphasized that the grid is only used when the components of the grid precisely match the characteristics of the claimant. Thus, the only role the guidelines play is to take administrative notice of the availability of jobs, or lack thereof, for claimants whose abilities are accurately described by the grid. Of course, if the claimant's characteristics do not fit the grid pattern, then, just as before, expert testimony would be required to satisfy the Secretary's burden of proof regarding the availability of jobs which this particular claimant can exertionally handle. *See also Walker v. Harris,* 504 F.Supp. 806, 811 (D.Kan.1980) ("We are in agreement with the Secretary that a vocational expert is not necessary when the factors of a claimant's residual functional capacity, age, education and work experience coincide with the criteria of a rule under the new regulations and the rule directs a conclusion as to whether the individual is or is not disabled."); *Frady v. Harris,* 646 F.2d 143 (4th Cir. 1981); *New v. Harris,* 505 F.Supp. 721 (S.D.Ohio 1980).

*Kirk,* 667 F.2d at 531.

Here, Welchance established a *prima facie* case of disability for her usual work and the Secretary applied the sequential review process. The ALJ modified the earlier July 29, 1986 findings that a nurse's aide was Welchance's usual work since 1970 Welchance had not worked as a nurse's aide except for six months. Under 20 C.F.R. § 404.1565, the Secretary considers work experience that was done within the last 15 years, lasted long enough for plaintiff to learn to do it and was substantial gainful activity.

The medical record here provides substantial evidence that Welchance's diagnosed impairments of severe degenerative disc disease of the lumbo sacral spine, status post by pass surgery for occlusive vascular disease of both legs, history of recurrent gastro-intestinal disease did not meet or equal a listed impairment. On September 30, 1984, the Medical Vocational Guidelines relevant to residual functional capacity for sedentary work were applicable to her.

With respect to her back, all physicians recommended conservative treatment in the form of exercise and pain medication. None suggested surgery. Further, Welchance was not taking an inordinate amount of medication for her back. In addition, the surgery performed on her leg did not occur until January, 1985. Nonetheless, after that date, Welchance did well after the surgery and her condition was not disabling for 12 months or more. Further, the medication resolved her gastritis disease. There is nothing in the record to indicate progressive deterioration of her back impairment or leg condition.

Thus, on this medical record, the Magistrate concludes that the ALJ's finding that Welchance's impairments did not equal or meet a listed impairment and that she is able to do sedentary work is supported by some evidence. However, the crucial question is whether the ALJ erred in categorizing Welchance as literate under the Medical Vocational Guidelines, "the grids."

The "grids" reflect the major functional patterns which are encountered in cases which can not be evaluated on medical considerations alone where an individual with a severe medical determinable physical or mental impairment is not engaging in substantial gainful activity and the individual's impairments prevent the performance of his or her vocationally-relevant past work. "The grids are a classification scheme that direct a finding of 'disabled' or 'not disabled' based on a claimant's age, education, work experience, and residual functional

capacity to perform work i.e. sedentary, light, medium or heavy work."

Under Part 404, Subpart P, Appendix 2, Rule 201.17, a younger individual in the age range of 45 to 49, whose education level is illiterate or unable to communicate in English and whose previous work experience is unskilled or none, is deemed disabled. However, Rule 201.19 also provides that a younger individual in this group with a limited education and with previous work experience of skilled or semi-skilled-skills that are not transferable, is not disabled. As noted earlier, Welchance asserts that the Secretary should have applied the former rule rather than the latter.

20 C.F.R. § 416.964 (1988) defines "Education" as follows:

### § 416.964 Your education as a vocational factor.

(a) *General.* "Education" is primarily used to mean formal schooling or other training which contributes to your ability to meet vocational requirements, for example, reasoning ability, communication skills, and arithmetical ability. However, if you do not have formal schooling, this does not necessarily mean that you are uneducated or lack these abilities. Past work experience and the kinds of responsibilities you had when you were working may show that you have intellectual abilities, although you may have little formal education. Your daily activities, hobbies, or the results of testing may also show that you have significant intellectual ability that can be used to work.

(b) *How we evaluate your education.* The importance of your educational background may depend upon how much time has passed between the completion of your formal education and the beginning of your physical or mental impairment(s) and by what you have done with your education in a work or other setting. Formal education that you completed many years before your impairment began, or unused skills and knowledge that were a part of your formal education, may no longer be useful or meaningful in terms of your ability to work. Therefore, the numerical grade *level that you completed in school may not represent your actual educational abilities. These may be higher or lower. However, if there is no other evidence to contradict it,* we will use your numerical grade level to determine your educational abilities. The term "education" also includes how well you are able to communicate in English since this ability is often acquired or improved by education. In evaluating your educational level, we use the following categories:

(1) *Illiteracy.* Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling.

(2) *Marginal education.* Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education.

(3) *Limited education.* Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education.

Welchance's numerical grade level is grade six, the actual grade she completed in school. Dr. Witt, who administered the psychological tests, concluded that Welchance, who has a reading level at 3.7 and arithmetic at 2.7 level, should be considered illiterate. Dr. Witt also reported that Welchance appears to be able to learn new procedures and acquire new information at a level that while below average, was sufficient for unskilled work. Nonetheless, there is no dispute that Welchance is illiterate. Use of a numerical grade level to determine educational abilities is only appropriate "if there is no other evidence to contradict it." 20 C.F.R. § 416.964(b). The

record establishes that Welchance is illiterate (tr. 234–35; tr. 331–32; tr. 340–34; tr. 345; and tr. 350).

Contrary to the ALJ's findings, Welchance does not have a marginal education. As found by Dr. Witt, Welchance does not have literacy with the ability to reason, to do arithmetic, or to use language skills. 20 C.F.R. § 416.964(b)(3). Marginal education presumes literacy and the ability to reason, to do arithmetic and to use language skills. *Dixon v. Heckler*, 811 F.2d 506, 510 (10th Cir.1987); *Dollar v. Bowen*, 821 F.2d 530, 535 (10th Cir.1987).

Thus, the Magistrate concludes that the ALJ finding that Welchance had a marginal education is unsupported by substantial evidence. In fact, the substantial evidentiary record clearly supports a finding of Welchance's illiteracy. Therefore, the ALJ should have applied Rule 201.17 of Part 404, Subpart P, Appendix 2, instead of 201.-19. Under Rule 201.17, Welchance, as of September 30, 1984, was a younger individual, prior work experience was none, illiterate and was disabled.

## IV. RECOMMENDATIONS

The Magistrate recommends that the District Court reverse the Secretary's finding because there is no substantial evidence to support it. Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to this Recommendation, with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed to this Report in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).