**Laura J. DIXON, Plaintiff-Appellant,**

**v.**

**Margaret M. HECKLER, Secretary, Department of Health and Human Services, Defendant-Appellee.**

No. 85–2089.

United States Court of Appeals, Tenth Circuit.

Feb. 2, 1987.

Paul F. McTighe, Jr., Tulsa, Okl., for plaintiff-appellant.

Edwin L. Meese, U.S. Atty. Gen., Roger Hilfiger, U.S. Atty., Lynda C. Burris, Asst. U.S. Atty., E.D. Okl., Gayla Fuller, Regional Atty., Gabriel Imperato, Deputy Regional Atty., Joseph B. Liken, Asst. Regional Atty., Thomas Stanton, Asst. Regional Atty., Office of the Gen. Counsel, U.S. Dept. of Health and Human Services, Dallas, Tex., for defendant-appellee.

Before LOGAN, MOORE, and TACHA, Circuit Judges.

LOGAN, Circuit Judge.

After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. *See* Fed.R. App.P. 34(a); Tenth Cir.R. 34.1.8. The cause is therefore ordered submitted without oral argument.

Laura J. Dixon appeals from a district court judgment affirming the denial of her application for Supplemental Security Income (SSI) benefits. After the state agency in Oklahoma and the Social Security Administration denied her application initially and on reconsideration, Dixon requested a hearing de novo before an Administrative Law Judge (ALJ). The ALJ

convened a hearing at which Dixon appeared without counsel, accompanied only by her sister. The ALJ subsequently issued a decision denying Dixon's claim for benefits, which became the Secretary's final administrative decision when the Appeals Council denied Dixon's request for review. The United States District Court for the Eastern District of Oklahoma affirmed the Secretary's denial of benefits, and this appeal followed.

On appeal Dixon asserts that the district court erred in affirming the Secretary's finding that Dixon was not disabled. Specifically, Dixon asserts that there was not substantial evidence to support the ALJ's findings that her medical impairment did not meet or equal a listed impairment, that she could perform light work, and that her nonexertional limitations did not preclude reference to the medical-vocational guidelines. Finally, Dixon asserts that the ALJ erred in categorizing her as literate under the grids.

In reviewing such findings of fact, we are not asked to reweigh the evidence or try the issues de novo, but only to determine whether there was substantial evidence in the record as a whole to support the finding. *Tillery v. Schweiker,* 713 F.2d 601, 603 (10th Cir.1983). Substantial evidence is more than a "mere scintilla," but less than a preponderance, and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

■ The record provides substantial evidence to support the ALJ's determinations that Dixon's diagnosed impairments did not meet or equal a listed impairment, and that the Medical Vocational Guidelines relevant to a residual functional capacity for light work were applicable to her. Dixon claimed impairments including myasthenia gravis, carpal tunnel syndrome, hyperthyroidism, high blood pressure, arthritis, and heart disease. Medical examinations and tests indicate that the effects of these conditions were mild, and well-controlled by low dosages of medication without negative side effects. Although Dixon and her sister testified to her disabling pain, dizziness and muscle weakness, the medical reports provided little corroboration or support for her contention that her condition precluded light work. Dixon was able to perform to near-normal levels in cardiovascular exercise tests; other tests revealed only minor muscle weakness and nerve impairment. Examination reports over time did not indicate progressive deterioration of Dixon's condition.

■ On this medical record, we cannot reverse the ALJ's finding that Dixon was capable of performing a full range of light work, not significantly compromised by her nonexertional limitations or by restrictions against heights and working around dangerous moving machinery, and his consequent recourse to the Secretary's Medical Vocational Guidelines, the "grids." The crucial question on appeal is whether the ALJ erred in categorizing Dixon as literate under the grids. As we explain below, that finding is necessary to the ALJ's conclusion, adopted by the Secretary, that Dixon was not disabled. We reverse because there is no substantial evidence in the record to support the ALJ's finding that Dixon is literate.

The Medical Vocational Guidelines, the "grids," are a classification scheme directing a finding of "disabled" or "not disabled" based on a claimant's age, education, work experience, and residual functional capacity to perform work (e.g., sedentary, light, medium, or heavy work). It is not contested that, for purposes of the grids, Dixon at age fifty-one was closely approaching advanced age and had no previous work experience. As we note above, there is substantial evidence in the record to support the ALJ's finding that Dixon could perform a full range of light work. Accordingly, the grid classifications at issue are Rules 202.09 and 202.10:

"TABLE NO. 2—RESIDUAL FUNCTIONAL CAPACITY: MAXIMUM SUSTAINED WORK CAPABILITY LIMITED TO LIGHT WORK AS A RESULT OF SEVERE MEDICALLY DETERMINABLE IMPAIRMENT(S)

| Rule | Age | Education | Previous Work Experience | Decision |
|---|---|---|---|---|
| 202.09 | Closely approaching advanced age. | Illiterate or unable to communicate in English. | Unskilled or none | Disabled. |
| 202.10 | " " | Limited or less—At least literate and able to communicate in English." | " " | Not disabled. |

20 C.F.R. Pt. 404, Subpt. P, App. 2, Table 2.

Under this pair of rules, a finding of literacy was necessary to the ALJ's determination that Dixon was not disabled. If Dixon is illiterate, then Rule 202.09 is applicable, directing the conclusion that Dixon is disabled. The ALJ found that Dixon had a "marginal education" and that Rule 202.10 "would direct a conclusion of 'not disabled.'" R. II, 24.

Although the issue of Dixon's literacy was raised in her petition for district court review and on appeal to this court, her educational level appears at no time to have been the focus of more than pro forma inquiry. The record of the administrative hearing includes this colloquy between Dixon and the ALJ:

"Q And you completed 6 grades in school and learned to read and write through basic calculations in arithmetic, adding, subtracting and that sort of thing? Correct?

A Not very well.

Q But some of it—

A Some of it.

Q Ok. Can you read a newspaper if you want to? Read the articles and understand them pretty well?

A No.

Q What sort of things do you read from time to time?

A I can—there's so many words that I can't pronounce.

Q Ok.

A That I don't—

Q Do you read letters and write letters?

A I can't write. I can't spell INAUDIBLE

Q Well, do you write letters sometimes?

A No, I can't spell enough words to write a letter.

Q Oh, so you don't even try?

A Well, I try—I write my name and write when I have to write—

Q Well, what—what kind of things do you have to write? Like grocery lists?

A Yes, I get the name off—

Q So you can read a little bit and write a little bit? Is that what you're saying?

A I can read a little bit and write a little bit.

Q Ok. Ok...."

R. II, 38–39.

Dixon's sister also testified:

"A ... she says, will you come by and—and take the—list for me and pick me up groceries or I do it in that way and it helps her out.

Q She makes out the list and—

A Un, hun.

Q —hands it to you?

A Well, she doesn't. Her husband writes it out. As she told you, she can't spell well enough to INAUDIBLE easy spelling words or INAUDIBLE."

R. II, 55. The only other evidence in the record, apart from several references to Dixon's years of formal schooling, is a passing comment in an October 1982 medical history and evaluation that Dixon "is unable to spell but can read." R. II, 313.

This record does not provide substantial evidence of Dixon's literacy. For purposes of applying the grids, illiteracy "means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling." 20 C.F.R. § 404.-1564(b)(1). This definition makes explicit that literacy turns upon the ability to write as well as to read. *Cf. Zayas v. Heckler*, 577 F.Supp. 121, 127 (S.D.N.Y.1983) (regulations require ability to read and write in English).

The ALJ's apparent reliance on Dixon's "marginal education" to establish her literacy is misplaced. Although Dixon reported six or possibly seven years of formal schooling, the Secretary's regulation provides for use of numerical grade level to determine educational abilities only if there is no other evidence to contradict it. Especially when many years have passed since completion of formal education, as in Dixon's case, "the numerical grade level ... completed in school may not represent ... actual educational abilities." 20 C.F.R. § 416.964(b).

There was evidence that Dixon could read, albeit with difficulty. Both Dixon and her sister, however, testified that she could not write. The 1982 medical history report that Dixon cannot spell is, if anything, independent evidence of her inability to write. Although the Secretary on appeal alleges that Dixon testified that she could "read a little bit and write a little bit," a closer examination of the record reveals that statement to be the result of

the ALJ's cross-examination of Dixon, a repetition by her of the ALJ's unfounded conclusion rather than reliable testimony to her alleged literacy. The ALJ drew negative inferences for which we can find no basis in the record ("... so you don't even try?") and cut off Dixon's attempts to respond to those inferences. On this record, there is simply no indication that Dixon could "write a simple message such as instructions or inventory lists," as required by the Secretary's own regulations for a finding of literacy. 20 C.F.R. § 404.-1564(b)(1).

It is clear that, under the Social Security Act, the claimant has the burden of proving a disability. *Channel v. Heckler*, 747 F.2d 577, 579 (10th Cir.1984). But it is equally clear that a Social Security disability hearing is a nonadversarial proceeding, in which the ALJ has a basic duty of inquiry, "to inform himself about facts relevant to his decision and to learn the claimant's own version of those facts." *Heckler v. Campbell*, 461 U.S. 458, 471, 471 n. 1, 103 S.Ct. 1952, 1959, 1959 n. 1, 76 L.Ed.2d 66 (1983) (Brennan, J., concurring). The duty of inquiry also extends to the district court in its review of the ALJ's determination. *See Hill v. Morton*, 525 F.2d 327, 328 (10th Cir.1975) (placing "an affirmative duty upon a district court reviewing administrative action to engage in substantial inquiry of the relevant facts as developed in the administrative record and then to define, specifically, those facts which it deems supportive of the agency's decision.").

The duty of inquiry takes on special urgency when the claimant has little education and is unrepresented by counsel. *Campbell*, 461 U.S. at 471, 103 S.Ct. at 1959; *see also Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir.1984); *cf. Tillery*, 713 F.2d at 602. That special urgency is evident in the instant case, where Dixon had no attorney at the hearing before the ALJ, and was accompanied only by her sister, who had no formal schooling whatsoever. R. II, 56. Neither the ALJ's colloquy with Dixon nor the district court's opinion evi-

dences the specific and nonadversarial inquiry the law requires.

We are aware of and sympathetic to the enormous caseload borne by the ALJs in the disability decision system of the Social Security Administration. *See Richardson*, 402 U.S. at 399, 91 S.Ct. at 1426 (Social Security system's structures and procedures "are of a size and extent difficult to comprehend"). The system must be run efficiently and expeditiously, but neither the ALJ nor the reviewing court is "appointed to process cases on an administrative assembly line." *Kane*, 731 F.2d at 1219. The present case illustrates that inefficiency and delay in rendering final decisions is the consequence of a breakdown in the nonadversarial inquiry process.

In reversing the Secretary's determination, it is within our discretion to remand to the Secretary for a further hearing or direct the district court to award benefits. *See, e.g., Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir.1984). There is evidence of Dixon's illiteracy in the record before us, despite the sparseness of that record. Moreover, at this point in the disability determination, the Secretary has the burden of showing that the claimant is not disabled. The ALJ accepted Dixon's initial showing of impairment, and found that she could not perform past relevant work. R. II, 19, 23. Once a showing is made of disability preventing the claimant from engaging in prior work activity, the burden shifts to the Secretary to show "that the claimant retains the capacity to perform an alternative work activity...." *Channel*, 747 F.2d at 579; *accord Kane*, 731 F.2d at 1219.

Given that the burden is on the Secretary to show Dixon's literacy at this point, we believe that further administrative proceedings would only further delay the appropriate determination and award of benefits. *See Podedworny*, 745 F.2d at 222 (production by Secretary of additional evidence to support finding of no disability doubtful when Secretary has burden of proof in already lengthy proceeding); *see also Broadbent v. Harris*, 698 F.2d 407, 414 (10th Cir.1983) (reversal with order to grant benefits when prima facie case of disability not sufficiently rebutted by Secretary). Accordingly, we REVERSE and REMAND with the direction that SSI disability benefits be awarded to Dixon from April 23, 1983.