Linda Y. YEATES, Plaintiff,

v.

Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.

No. CIV.A. 01–2377–KHV.

United States District Court,
D. Kansas.

March 6, 2002.

**1320**

Joan H. Deans, J. H. Deans Law Office, Raytown, MO, for Plaintiff.

Janice M. Karlin, Office of United States Attorney, Kansas City, KS, for Defendant.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

Linda Y. Burger–Yeates brings suit under 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the Commissioner's decision to deny disability benefits under Title II of the Social Security Act ("SSA"), 42 U.S.C. § 401 *et seq.*, and supplemental security income ("SSI") benefits under Title XVI of the SSA, 42 U.S.C. §§ 1381 *et seq.*[1] This matter is before the Court on plaintiff's *Motion For Judgment* (Doc. # 6) filed November 21, 2001. For reasons stated below, the Court overrules plaintiff's motion.

1. Two social security disability benefit programs are available: disability insurance for qualified individuals who paid social security taxes for the relevant period, and supplemental security income ("SSI") for individuals who did not. The pertinent regulations are the same for both programs. *See Eads v. Sec'y of Dep't of HHS,* 983 F.2d 815, 816 (7th Cir.1993).

2. Plaintiff states that she filed her first application on July 28, 1998, *see Memorandum In Support Of Motion For Judgment* ("*Plaintiff's Memorandum*") (Doc. # 7) filed November 21, 2001 at 1–2, but that application is not part of the court record. Plaintiff filed a second application on July 28, 1999. *See* Tr. 101–03.

3. From 1982 to 1997, plaintiff earned the following amounts: 1982–$1,014.33; 1983–zero; 1984–$119.03; 1985–$4,250.24; 1986–

## I. Procedural Background

Plaintiff filed applications for SSI and disability insurance benefits, claiming that she was disabled beginning May 31, 1998.[2] On October 18, 1999, an Administrative Law Judge ("ALJ") conducted an evidentiary hearing regarding plaintiff's claim. Tr. 28–69. On October 29, 1999, the ALJ found that plaintiff was not disabled. Tr. 14–26. The Appeals Council denied plaintiff's request for review. Tr. 6–7.

## II. Factual Evidence

### A. Plaintiff's Testimony

Linda Y. Burger–Yeates is 49 years old. Tr. 32. She dropped out of high school but obtained a GED in 1974. *Id.* Plaintiff has been married for 24 years and has no children. *Id.* She receives no income. Tr. 38. From 1982 to 1997, plaintiff held over 25 different jobs, including cashier, waitress, certified nurse's aid, bus driver, house worker and electronics assembler. Tr. 90–95, 162. During that time, she earned an average of $1,877.45 per year.[3] Tr. 90–95. From 1967 to 1981, plaintiff earned an average of $1,875.83 per year.[4]

$2,156.94; 1987–$2,345.00; 1988–zero; 1989–$1,407.26; 1990–zero; 1991–$2,403.24; 1992–$2,602.47; 1993–$48.00; 1994–$4,126.43; 1995–$4,564.59; 1996–$1,151.05; 1997–$3,850.59. Her total earnings equal $30,039.17, with a yearly average of $1,877.45 ($30,039.17/16 = $1,877.448).

4. From 1967 to 1981, plaintiff earned the following amounts: 1967–$37.80; 1968–$526.13; 1969–$481.63; 1970–$2,144.48; 1971–$1,004.09; 1972–$4,185.18; 1973–$368.92; 1974–$1,077.42; 1975–$3,537.60; 1976–zero; 1977–zero; 1978–$2,939.78; 1979–$4,391.42; 1980–$4,846.36; 1981–$2,596.65. Her total earnings equal $28,137.46, with a yearly average of $1,875.83 ($28,137.46/15 = $1,875.83).

Tr. 96. Plaintiff's husband, who is on dialysis, receives $669 a month. Tr. 38, 63. Plaintiff testified that she does not take care of her husband in any way. Tr. 63.

In 1984, plaintiff suffered an injury to her back. Tr. 34–35. She underwent surgery, but suffered a second back injury in 1990. Tr. 35. Dr. Jeffrey T. MacMillan, M.D., an orthopaedic surgeon, regularly treated plaintiff until 1998. Tr. 35, 250. Dr. MacMillan recommended a second surgery, but he projected only 40 per cent improvement. Tr. 36. Plaintiff did not opt for a second surgery because she did not have insurance coverage. *Id.* Dr. MacMillan referred plaintiff to a pain management clinic, where Dr. Danner gave her vicodin [5] and methadone.[6] Tr. 37. Plaintiff testified that Dr. MacMillan stopped seeing her in 1998 because she could not afford surgery. Tr. 36. Plaintiff also said that Dr. MacMillan told her that she needed to go to rehabilitation because he feared that she was addicted to her pain medication. Tr. 35–36. Plaintiff never paid Dr. MacMillan. Tr. 36. She owes him about $600. *Id.* Dr. Danner stopped treating plaintiff in 1999 because she owed $1,500. Tr. 37.

Plaintiff last worked on May 31, 1998 as a cashier and in the pet department at Wal–Mart, a position which she held for nine months. Tr. 33. She worked part-time, 25 to 30 hours a week. *Id.* She quit working because of back pain. Tr. 33–34. Plaintiff testified that she was unable to stand for long periods of time, and Wal–Mart allowed her to sit only at break time. Tr. 34. Plaintiff also testified that about five months after she started working at Wal–Mart, she began missing work about three to four days a week because she

could not get out of bed and her back was so stiff that she could hardly walk. *Id.* Plaintiff lifted up to 25 pounds of kitty litter at Wal–Mart. Tr. 61. After she refused to lift a 50 pound bag of dog food, she was written up and became a cashier. Tr. 61–62. Plaintiff said that she has not lifted anything heavy since she stopped working at Wal–Mart. Tr. 62.

When plaintiff quit working, she could drive, clean house, do latch work and puzzles, watch television and walk her dog. Tr. 57. Plaintiff estimated that she could stand on her feet for 45 minutes and sit for 10 minutes at a time. Tr. 59–60. She performed light housework with frequent breaks every 15 to 20 minutes, stood in the kitchen to cook part of a meal, and walked her dog for about 35 to 40 minutes. Tr. 59–60. Plaintiff took naps every day in the morning and afternoon. Tr. 60.

Plaintiff testified that her condition has deteriorated in the last six months. Tr. 56–57. Plaintiff said that she does not do much housework because when she gets up and tries to do things around the house, she ends up in bed for a week. Tr. 50. Plaintiff also testified that she used to drive, but it hurts her back to apply the brake and to sit for a long time. Tr. 50–51. Plaintiff last drove three weeks ago. Tr. 50. Plaintiff shops for groceries in a motorized cart, with her husband's help. Tr. 51. Plaintiff's husband does the laundry, and they take turns cooking. *Id.* Plaintiff tries to attend church every week. At church, plaintiff usually sits, stands and kneels along with everybody else. Tr. 51–52. Sometimes she has to get up and go to the back of the church or go home because of back pain. Tr. 52. Plaintiff did

---

5. Vicodin contains a semisynthetic narcotic analgesic and is administered to relieve moderate to moderately severe pain. *See Physicians' Desk Reference* at 1501–03 (54th ed.2000).

6. Methadone contains a synthetic narcotic analgesic and is prescribed to relieve severe pain and to detoxify and temporarily maintain treatment of narcotic addiction. *See Physicians' Desk Reference* at 2711–13.

not feel like attending church the weekend before the hearing because her back hurt. *Id.* Plaintiff testified that she can bend over to pick up a small object off the floor, but it is painful. Tr. 62–63. If her legs are not bothering her, she can stoop down to pick up something off the floor. Tr. 63. Before she began having problems with her legs and sciatic nerve, plaintiff could kneel and crouch. Tr. 63.

During the last year, plaintiff has been treated by St. Vincent Clinic ("the clinic"), where she pays on a sliding scale according to income. Tr. 38. In the beginning, plaintiff went to the clinic "quite often." Tr. 38. Her visits then tapered off because the nurse practitioner got her "medicine and everything all under control." *Id.* Plaintiff started going back to the clinic, however, when she began experiencing breathing problems. *Id.*

About four months before the hearing, plaintiff went to the emergency room at St. John's Hospital because she was short of breath. Tr. 47. The emergency room staff recommended a breathing machine for asthma. *Id.* Plaintiff had taken medicine for asthma when she was young, but thought she had outgrown it. Tr. 45. Plaintiff believes that stress from her back pain triggered her asthma. Tr. 48. Plaintiff testified that she administers breathing treatments to herself four times a day: when she first wakes up, around 11:30 a.m., around 3:30 p.m. and at bedtime. Tr. 46. Each treatment takes about 15 to 20 minutes. *Id.* Plaintiff stated that she feels lightheaded as a result of the treatments and has to lie down afterwards for 20 to 30 minutes. Tr. 46–47.

At the time of the hearing, all of plaintiff's medications were prescribed by the clinic. Tr. 38–39. The clinic does not have a doctor to prescribe narcotics. Tr. 39. Plaintiff takes about six Advil a day for pain. Tr. 39. She testified that she feels constant pain in her back and legs. Tr. 42.

Plaintiff relieves the pain by lying in bed with her feet propped up and alternating heating and cooling pads on her lower back. Tr. 42. She testified that she has been doing this all day, every day for the past six or seven months, since she stopped taking vicodin. Tr. 42–43.

Plaintiff testified that she can no longer perform her past jobs because, "I have the muscle spasms real bad in my back if I move just right. And my legs hurt constantly. There was no letting up." Tr. 41. Plaintiff said that she experienced no pain when she was on methadone and vicodin. Tr. 43. She nevertheless testified that even if she currently took such medication, she could not work because of leg problems which surfaced about four months ago. Tr. 43–44. About three months before the hearing, plaintiff began taking neurontin for restless legs—or small seizures in her legs—a condition which she experiences at night. Tr. 39, 64.

About four months before the hearing, plaintiff began taking serzone for depression. Tr. 48. Before she began taking the medicine, plaintiff would cry easily, sleep all day, not eat and not get along with her husband. Tr. 49. The serzone effectively relieves these symptoms. *Id.* Despite the medicine, plaintiff still gets tired of being cooped up and lying in bed all the time, because "[t]hat's not much of a life." Tr. 50.

During the past year, plaintiff has worn an arm brace for pain in her right wrist and hand. Tr. 53. She wears it when her wrist is bothering her, which is usually when the weather is cold. Tr. 53.

**B. Medical Evidence**

John A. Mallory, M.D., treated plaintiff from 1990 to 1998. During this time, Dr. Mallory treated various ailments including colds, constipation, bladder infection, high blood pressure, gastritis, diarrhea, hor-

mone replacement, weight control, depression and back pain. Tr. 169–82.

On April 10, 1991, Dr. Mallory examined plaintiff for back pain. Tr. 180. Over the weekend, plaintiff had hurt her back by moving furniture. *Id.* She had visited a hospital emergency room and received darvocet[7] and flexeril.[8] *Id.* Dr. Mallory prescribed voltarin and refills of darvocet and flexeril. *Id.* He opined that plaintiff could return to work the following week. *Id.*

On June 1, 1993, Dr. Mallory's office refused to refill plaintiff's darvocet prescription over the telephone because she had not been into the office since February 1992. Tr. 178.

On June 11, 1993, Dr. Mallory examined plaintiff for back pain. *Id.* He noted that plaintiff had not visited the office because of finances—she could not pay her bill and had been receiving prescriptions over the telephone. *Id.* Dr. Mallory diagnosed chronic low back pain and hypertension. *Id.* He prescribed darvocet for back pain and maxzide for high blood pressure. *Id.* Dr. Mallory did not charge plaintiff for the visit. Tr. 177.

On January 3, 1994, plaintiff requested a refill of darvocet. Tr. 176. Dr. Mallory's office advised her that the refills were becoming too constant and that she should see an orthopedic surgeon to find out why she had such persistent pain. *Id.*

In 1994 and 1996, plaintiff experienced problems with asthmatic bronchitis. Tr. 172–73, 176, 223. She was hospitalized for the problem in 1994. Tr. 228.

On March 1, 1994, Dr. Mallory noted that plaintiff had performed domestic work in the past but was disabled because of back pain. Tr. 228.

On May 29, 1995, plaintiff sought emergency treatment for back pain. Tr. 218. Plaintiff complained that she had hurt her back the previous night while bending at work. *Id.* Plaintiff reported that she had experienced back problems in the past, but it had not bothered her for some time. *Id.* The emergency department prescribed bed rest, moist heat, vicodin and flexeril and advised plaintiff to follow up with an orthopedic surgeon. *Id.*

On June 16, 1995, Jeffrey T. MacMillan, M.D., an orthopaedic surgeon, performed an initial industrial evaluation of plaintiff. Tr. 250. He noted that plaintiff had injured her lower back while working as a waitress at Shoney's. *Id.* Dr. MacMillan opined that plaintiff suffered from degenerative disease in her lumbar spine and spinal stenosis, L4–5, and that she was temporarily totally disabled. Tr. 253. He prescribed daypro[9] and flexeril and planned for plaintiff to take epidural steroid injections, participate in a low back program and follow up in two weeks.

On July 3, 1995, Dr. MacMillan reported minimal improvement with anti-inflammatory medicine. Tr. 248–49. He planned for plaintiff to try epidural steroid injections, continue daypro, continue an abdominal and trunk strengthening exercise program, engage in an aerobic walking program and follow up in four weeks. Tr. 249.

On July 31, 1995, Dr. MacMillan reported 50 per cent improvement in plaintiff's condition. An MRI of the lumbar spine revealed significant degenerative changes

---

7. Darvocet contains a mild narcotic analgesic and is used to relieve mild to moderate pain. *See Physicians' Desk Reference* at 1574.

8. Flexeril is prescribed to relieve muscle spasm associated with acute, painful musculoskeletal conditions. *See Physicians' Desk Reference* at 1797.

9. Daypro is a nonsteroidal anti-inflammatory drug. *See Physicians' Desk Reference* at 2909.

at L4–5 with no evidence of spinal stenosis or recurrent herniation. Tr. 246–47. Dr. MacMillan diagnosed degenerative disk disease and noted that he would have to focus his treatment on chronic back pain. Tr. 247. He planned to try a TENS unit and an oral inflammatory drug for pain. *Id.* In addition, he wanted plaintiff to continue with her exercise and walking programs and follow up in four weeks. *Id.* He released plaintiff to return to work light duty, avoiding repetitive bending, stooping and lifting or carrying more than 25 pounds. *Id.* He opined that plaintiff "should return to a work environment as quickly as possible." *Id.*

On November 25, 1995, plaintiff was hospitalized for three days for chest pain. Tr. 201–217. She was diagnosed with reflux esophagus. Tr. 201, 217. At that time, plaintiff reported that she took two darvocet per week for back pain. Tr. 203.

On May 28, 1996, Dr. MacMillan re-evaluated plaintiff's back pain. Tr. 244. Plaintiff reported that she had been functioning well for several months with minimal discomfort, but that her pain had returned about three weeks ago with no antecedent injury. Tr. 244. Plaintiff complained of pain radiating across her low back from one hip to the other, generally worse in the morning and after work in the evenings. *Id.* Dr. MacMillan prescribed cataflam and k-pad. *Id.* He told plaintiff to do abdominal and trunk strengthening exercises and follow up in four weeks. *Id.*

On June 28, 1996, plaintiff returned to Dr. MacMillan. Tr. 243. She had felt significantly improved with the cataflam, but she fell at work and was experiencing significantly increased low back pain radiating down her right thigh to the knee. *Id.* Dr. MacMillan switched plaintiff from cataflam to oruvail and advised her to continue k-pad and her home exercise program. *Id.* He also recommended that she resume using her TENS unit and follow up in four weeks. *Id.*

On July 23, 1996, plaintiff told Dr. Mac-Millan that she used her TENS unit on an intermittent basis. Tr. 243. Plaintiff had not been able to take oruvail due to dyspepsia, so she was taking vicodin. *Id.* She complained of "activity limiting low back pain radiating across the top of her hips into her left buttock and down the postero-lateral aspect of her left thigh." *Id.* Dr. MacMillan examined:

Motor strength is 5/5 in all major muscle groups. Sensation is intact to light touch and all major dermatomes. Paterllar and Achilles tendon reflexes are 1+ and symmetric. Straight leg raising is positive from the left side only.

Tr. 243. Dr. MacMillan planned for plaintiff to continue vicodin, begin taking elavil, continue using her TENS unit and follow up in four weeks. *Id.*

On August 20, 1996, plaintiff reported no improvement. Tr. 242. She also complained of mild leg pain with extended periods of walking. *Id.* She used elavil nightly and vicodin on a regular basis. *Id.* She also used her TENS unit intermittently, but reported that it provided minimal relief. *Id.* Dr. MacMillan advised plaintiff to continue using vicodin, elavil and her TENS unit. *Id.* He asked her to follow up in six weeks, noting that if her pain persisted he would consider proceeding with fusion after a disability evaluation. *Id.*

On December 10, 1996, plaintiff related that her low back pain was progressively worsening, especially with cold weather. Tr. 242. She complained of "significant pain radiating across her back at the waistline into both buttocks and down both lower extremities" and stated that her current standing and walking tolerance was about 35 minutes. *Id.* Plaintiff reported that her symptoms were worse immediately upon lying down at night, and that her pain medication resolved the symptoms

quickly. *Id.* Dr. MacMillan planned to discontinue plaintiff's use of narcotics. He prescribed darvocet and naprosyn and asked plaintiff to follow up in six weeks.

On January 28, 1997, plaintiff told Dr. MacMillan that her radicular pain was increasing significantly and that she was having difficulty controlling the discomfort with medication. Tr. 241. Plaintiff stated that she could not stand or walk longer than 15 minutes without debilitating discomfort. *Id.* Dr. MacMillan observed:

> Lower extremity strength is 5/5 in all major muscle groups. Sensation is intact to light touch in all major dermatomes. Patellar and Achilles tendon reflexes are 1+ and symmetric. Straight leg raising provokes mild low back pain on the left. Lasegue's sign is mildly positive on the left.

Tr. 241. He recommended a lumbar myelogram and CT scan and advised plaintiff to continue vicodin and follow up in two weeks. *Id.*

On February 11, 1997, Dr. MacMillan noted that an MRI of plaintiff's lumbar spine demonstrated the following:

> disc desiccation at L2–L3 to L5–S1. The most severe level appears to be L4–L5. Slight disk bulging is present at L2–L3 and L4–L5. There is no evidence of disc herniation or stenosis. Increased signal intensity is present in the vertebral bodies at L4 and L5.

Tr. 241. He discussed alternative treatments with plaintiff, noting that she was unlikely to achieve complete pain relief due to the diffuse nature of her disk disease. *Id.* Plaintiff planned to discuss her options with her husband. *Id.*

On February 14, 1997, Dr. MacMillan discussed the possibility of surgery with plaintiff and her husband. Tr. 240. Dr. MacMillan opined that any surgical treatment would not relieve all of plaintiff's pain; at most, she could expect 40 to 50 per cent improvement. *Id.*

On May 25, 1997, plaintiff visited a hospital emergency room for back pain. Tr. 199. She complained of lower back pain with bending or twisting, stating that she had strained it the previous day while working as a waitress. *Id.* A physical exam revealed that "[m]uscle strength is 5/5. Gait is normal—there is no limp. There is pain with flexion of the hip. Bilateral positive straight leg raising." *Id.* The doctor diagnosed lumbar strain and prescribed naprosyn, valium and percocet. *Id.*

On June 10, 1997, Dr. MacMillan referred plaintiff to Shavone Danner, M.D., for chronic pain management. Tr. 239. He reported that

> [a]lthough she is a candidate for an anterior interbody fusion, she does not currently have insurance coverage to proceed with the surgery. Consequently, she would like to proceed with a chronic pain management program. She is currently using one to two Vicodin every six hours to enable her to continue working. She has also resumed using Elavil. I suggested she work with you on finding a long term opiate which might be more convenient than her current Vicodin.

*Id.*

On June 11, 1997, Dr. Mallory prescribed prozac for depression. Tr. 170. On March 7, 1997, Dr. Mallory noted that plaintiff planned to have surgery on her back as soon as she obtained Medicare disability. Tr. 171.

On August 5, 1997, Dr. MacMillan reevaluated plaintiff's back pain. Tr. 240. Plaintiff had been working 40 to 50 hours a week as a waitress and was receiving methadone from Dr. Danner. *Id.* Plaintiff reported significant improvement in her level of function, but noted no change in her low back pain, with pain radiating into the proximal left thigh. *Id.* Plaintiff also reported a new onset of numbness in the

right third toe. *Id.* Dr. MacMillan diagnosed low back pain, Morton's neuroma and right metatarsalgia. *Id.* He recommended that plaintiff continue with pain management under Dr. Danner and follow up as needed. *Id.*

On February 25, 1998, plaintiff visited a hospital emergency room with complaints of inability to sleep, depression and nervousness. Tr. 197. Plaintiff believed that she was experiencing drug withdrawal because her pain clinic had weaned her prescription of methadone. *Id.* The emergency room doctor agreed and consulted with Dr. Mallory over the telephone. Tr. 168, 199. They referred plaintiff to the KU Methadone Clinic and prescribed clonidine, resoril and advil. *Id.* Later that day, plaintiff called Dr. Mallory and told him that she could not afford to pay the required $7.00 per day at the KU Methadone Clinic. Tr. 168.

On February 27, 1998, plaintiff visited Dr. Mallory for methadone withdrawal, back pain and depression. Tr. 168. Dr. Mallory reported that plaintiff was "quite upset for the fact that she was taken off the Methadone primarily because she really couldn't afford to pay her doctor bills." *Id.* Dr. Mallory increased her dosage of clonidine and gave her samples of prozac for depression. *Id.*

On March 31, 1998, plaintiff reported that she had been using vicodin on a regular basis. Tr. 238. She had discontinued naprosyn due to complaints of dyspepsia. *Id.* Dr. MacMillan prescribed elavil, vicodin, flexeril and advil and told plaintiff to follow up as needed. *Id.*

On May 3, 1998, plaintiff returned to Dr. MacMillan. Tr. 238. Plaintiff reported a severe increase in low back pain with muscle spasm. *Id.* Plaintiff also reported pain radiating down both lower extremities, worse on the right side, and aching in her right forearm, particularly at night. *Id.* Dr. MacMillan noted the following:

> Ms. Burger stands with level shoulders and pelvis. She has normal dorsal kyphosis and lumbar lordosis. There is no soft tissue swelling and no tenderness. She is able to reach within 8 inches of the floor, limited by low back pain but no lower extremity radicular symptoms. Lower extremity strength is 5/5 in all major motor groups. Sensation is intact to light touch in all major dermatomes with subjective reports of dullness along the lateral aspect of the right lower extremity. Patellar and Achilles tendon reflexes are 2+ and symmetric. Lasegue's sign are negative. Heel and toe walking are intact. Gait is normal. There is no soft tissue swelling or tenderness about the left forearm. Resisted wrist dorsiflexion does not provoke any discomfort. Neurologic and vascular function remain intact.

Tr. 238. Dr. MacMillan prescribed naprosyn and elavil and asked plaintiff to follow up in four weeks. *Id.*

On September 4, 1998, plaintiff returned to Dr. MacMillan. Tr. 237. She complained of "persistent activity related waistline low back pain, now with numbness radiating down the posterolateral aspect of her right lower extremity while laying [sic] in bed early in the morning." Tr. 237. Plaintiff's symptoms generally resolved once she got "up and around." *Id.* Plaintiff also complained of increasing pain radiating into both buttocks, and about the expense of her medication. *Id.* Dr. MacMillan observed:

> Ms. Burger is able to reach with 10 inches of the floor, limited by waistline low back pain. Lower extremity strength is 5/5 in all major motor groups. Sensation is intact to light touch in all dermatomes. Patellar and Achilles tendon reflexes are 2+ and symmetric. Straight leg raising and Laseque's sign are negative. Heel and toe walking are intact. Gait is normal. Internal and external rotation of the hips

does not provoke complaints of discomfort.

*Id.* Dr. MacMillan advised plaintiff to continue her elavil and flexeril, switch vicodin to oxycontin [10] and follow up as needed. *Id.*

On October 1, 1998, David R. Mouille, Ph.D., interviewed plaintiff and performed a mental status examination. Tr. 230–33. Plaintiff told Dr. Mouille that she quit her job at Wal–Mart because "she became stressed and missed too much work." Tr. 230. Plaintiff reported symptoms of depression, and Dr. Mouille noted that she was constantly agitated and wringing her hands. Tr. 230–31. According to Dr. Mouille, plaintiff

> describes herself as living a very simple day, but is being [sic] quite autonomous. She spends her day watching TV, caring for her dog, doing chores and taking naps. She is able to maintain her own schedule, able to prepare meals for herself, able to shop, able to drive, able to pay bills, able to do chores, able to babysit, able to do lawn work, able to use public transportation. She needs to be reminded to take a bath and would prefer to avoid bathing. With her friends she enjoys reading the Bible and talking about God.

Tr. 232. Dr. Mouille concluded that plaintiff's psychopathology resulted in the following: (1) plaintiff's ability to perform daily living activities is reduced but not impaired; (2) plaintiff's ability to establish and maintain adequate relationships with co-workers and supervisors is reduced but not impaired; (3) plaintiff's ability to understand and perform simple tasks in an average amount of time is not impaired; (4) plaintiff's ability to sustain concentration on simple, unskilled, routine, repetitive activities for an eight-hour day is not impaired; and (5) plaintiff's ability to maintain an adequate work schedule with average performance demands is not impaired. Tr. 233.

On November 17, 1998, JoAnn M. Peterson, A.R.N.P., treated plaintiff at St. Vincent's Clinic for right elbow tendinitis and probable sinusitis. Tr. 269.[11]

On December 8, 1998, plaintiff visited Dr. MacMillan. Tr. 237. She reported using four vicodin per day for the last year. *Id.* Plaintiff stated that she fell in the bath tub three weeks earlier, which provoked back pain and lower extremity aching. *Id.* Plaintiff indicated that the lower extremity pain was generally worse at night when she lay down to sleep, and that it prevented her from falling asleep. *Id.* Plaintiff reported that she was able to perform household chores without significant difficulty, and that she was caring for her husband, who was on dialysis. *Id.* Dr. MacMillan observed:

> Ms. Burger is able to reach within six inches of the floor, limited by waistline low back pain, but no lower extremity radicular symptoms. The lower extremity strength is 5/5 in all major motor groups. Sensation is intact to light touch in all major dermatomes. Patella and Achilles' tendon reflexes are 2 + and symmetric. Straight leg raising and Lasegue's sign are negative bilaterally. Heel and toe walking are intact. Gait is normal.

Tr. 237. Dr. MacMillan recommended that plaintiff consult her family physician for continued pain medication and "poten-

---

**10.** Oxycontin is a opioid analgesic used to manage moderate to severe pain. *See Physicians' Desk Reference* at 2537–38.

**11.** It appears that the record may not contain all of plaintiff's medical records from St. Vincent's Clinic. The entry for November 17, 1998 states that it is continued, but the previous page is not part of the record. *See* Tr. 269, 320.

tial vascular evaluation to rule out nonneurogenic sources of leg pain." *Id.* He advised her to follow up as needed. *Id.*

On December 9, 1998, plaintiff visited St. Vincent's Clinic with complaints of insomnia, nervousness and depression. Tr. 269. Plaintiff reported that "[h]er husband is on renal dialysis and . . . this takes quite a bit of her time and effort, not only to get him to and from his treatment, but also in terms of his meals and his compliancy." *Id.* Plaintiff also reported that she had been on hydrocodone [12] during the last year for back pain. *Id.* Plaintiff stated that her doctor had released her from his care and was reducing her dosage of hydrocodone. *Id.* Plaintiff also complained of intermittent chest pain. Tr. 269–70.

On December 23, 1998, Ms. Peterson treated plaintiff for hypothyroidism and anxiety. Tr. 268. On January 20, 1999, plaintiff returned to the clinic, reporting that she was "feeling much better than she has in a long time." Tr. 268. Plaintiff was no longer taking hydrocodone and had more energy than before. *Id.* Plaintiff also reported that her anxiety had responded well to serzone. *Id.*

In February 1999, Ms. Peterson treated plaintiff for bronchitis. Tr. 323. From March to July 1999, Ms. Peterson continued to treat plaintiff for cough, allergies and depression. Tr. 324–329.

On March 14, 1999, plaintiff saw Jody Morrison, M.S.W., A.R.N.P., at the clinic for low back pain. Tr. 326. Plaintiff reported that she was taking amitriptyline, which provided slight relief. Tr. 326. Plaintiff said that she had previously taken serevent, but discontinued it because of price. Ms. Morrison noted that

> [p]resently she is able to do approximately 30 [degrees] straight leg raise until she gets into a lot of pain, actually in both of her lower extremities. She is unable to bend over and touch her toes and has point tenderness in lumbar region, but has positive circulation in her feet and legs.

Tr. 326. Ms. Morrison advised plaintiff to begin taking neurontin, noting that she would start plaintiff on the indigent program to increase her doses.[13] *Id.* She also recommended warm moist packs, massage and ultrasound three times per week for the next two weeks. *Id.*

On May 28, 1999, plaintiff continued to complain of low back pain. Tr. 326. She said that had attended only one physical therapy session because it made her back hurt worse. *Id.* Plaintiff had also stopped taking neurontin, because she could not afford it. *Id.* Plaintiff stated that she would like to take serzone,[14] but not if she had to pay for it. *Id.* Ms. Peterson diagnosed allergies, mild persistent asthma and low back pain. Tr. 327. She prescribed amitriplyline, serzone, relafen,[15] serevent and flovent [16] and asked plaintiff to return in June for a full physical. *Id.*

---

**12.** Hydrocodone is the semisynthetic narcotic analgesic which is contained in vocodin. *See Physicians' Desk Reference* at 1501

**13.** Neurontin is used "as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults with epilepsy." *See Physicians' Desk Reference* at 2271. Although the medical notes from May 14, 1999 do not mention restless legs, a later notation indicates that the clinic prescribed neurontin in May for back pain and restless legs. *See* Tr. 330.

**14.** Serzone is used to treat depression. *See Physicians' Desk Reference* at 849.

**15.** Relafen is prescribed for "acute and chronic treatment of signs and symptoms of osteoarthritis and rheumatoid arthritis." *See Physicians' Desk Reference* at 3035–36.

**16.** Serevent and flovent are inhaled to treat asthma. *See Physicians' Desk Reference* at 1269–74, 1186–92.

On June 9, 1999, Ms. Peterson performed a full physical exam on plaintiff. Tr. 327. Plaintiff's chief complaint was a cough since January. Plaintiff also stated that she had a history of asthma and used two inhalers—flovent and serevent. *Id.* Plaintiff admitted, however, that she used flovent less often and "not as faithfully." *Id.* Plaintiff reported that she was responsible for all of the domestic burden and caring for her ill husband and ill brother-in-law. *Id.* Plaintiff was experiencing a high level of anxiety because her husband had told her that he would stop dialysis if he did not receive a kidney by the end of summer. *Id.* Ms. Peterson increased plaintiff's dosage of serzone and encouraged her to use her inhalers faithfully. Tr. 328.

On July 9, 1999, plaintiff reported that she had stopped taking neurontin. Tr. 330. Ms. Peterson advised her to continue taking the medicine. *Id.*

On August 5, 1999, Ms. Peterson noted that plaintiff's hypertension was in good control and her asthma was in fair control. Tr. 330. Plaintiff reported that she was using her nebulizing treatment at least four times a day to keep her wheezing under control. *Id.* Plaintiff also reported that she felt better than she had in a long time. *Id.*

On September 3, 1999, plaintiff presented no complaints to St. Vincent's Clinic. Tr. 331. She was planning to go out of town for about two months. Plaintiff reported that neurontin was helping her leg pain, and Ms. Peterson increased her dosage. *Id.*

On October 8, 1999, plaintiff told Ms. Peterson that she had discontinued using serevent and flovent a couple of months ago because serevent caused her to shake. Tr. 331. As a result, plaintiff was experiencing more wheezing. *Id.* Ms. Peterson noted that plaintiff's asthma was stable and directed plaintiff to resume using serevent and flovent. *Id.*

## C. Vocational Expert

The Commissioner retained Janice Hastert to testify as a vocational expert. The Commissioner asked Hastert to consider the following hypothetical:

> assume an individual of the same, [sic] education, and work experience of the claimant in this case. I'd like you to assume that this individual can lift and carry 20 pounds on an occasional basis, ten pounds frequently. Can stand and walk for at least 30 minutes at a time for a total of four hours in an eight-hour day. Can sit for at least 30 minutes at a time for a total of four hours in an eight-hour day. This individual can also bend—only occasionally bend over, stoop, and squat.

Tr. 65. Based on this hypothetical, Hastert testified that plaintiff would not have transferrable skills, but that she could perform sedentary and unskilled jobs of security monitor, cafeteria cashier and office helper. Tr. 65–66. Hastert opined that 75,000 security monitor jobs existed nationally with 300 located in Kansas; 162,-000 cafeteria cashier jobs existed nationally with 1,050 located in Kansas; and 51,000 office helper jobs existed nationally with 500 located in Kansas. Tr. 66.

The Commissioner asked Hastert to consider a second hypothetical:

> assume that this individual can lift and carry only ten pounds occasionally and negligible weights frequently, can stand and walk for only 15 minutes at a time for a total of two hours in an eight-hour day, can sit for up to 45 minutes at a time for a total of six hours in an eight-hour day. Is restricted from bending over to the floor, stooping, or squatting.

Tr. 67. Based on this hypothetical, Hastert testified that plaintiff could perform

the same sedentary and unskilled jobs: security monitor, cafeteria cashier and office helper. Tr. 67.

Finally, the Commissioner asked Hastert to consider a third hypothetical:

assume that this individual because of a severe back problem requires at least two periods of one hour lying down rest during the workday.

Tr. 67. Based on this hypothetical, Hastert testified that plaintiff could not perform any work in the national economy. *Id.* 67.

### III. ALJ's Findings

The ALJ made the following findings:

1. The claimant met the disability insured status requirements of the Act on May 31, 1998, the date the claimant stated she became unable to work, and has acquired sufficient quarters of coverage to remain insured through at least March 31, 2000.

2. The claimant has not engaged in substantial gainful activity since May 31, 1998.

3. The medical evidence establishes that the claimant has degenerative disc disease of the lumbar spine, an impairment which is severe but which does not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's statements concerning her impairments and their impact on her ability to work are not entirely credible.

5. The claimant retains the residual functional capacity to engage in work at the sedentary exertional level, or work which requires lifting or carrying up to 20 pounds occasionally and up to 10 pounds frequently, sitting up to 30 minutes at a time not to exceed 4 hours of an 8 hour day, and standing or walking up to 30 minutes at a time not to exceed 4 hours of an 8 hour day. The claimant should avoid work requiring more than occasional bending over, stooping, or squatting.

6. The claimant is unable to perform her past relevant work.

7. The claimant is 49 years old, a "younger individual age 45–59."

8. The claimant has a high school education.

9. The claimant has semi-skilled work experience but no transferable work skills.

10. Based on an exertional capacity for sedentary work, and the claimant's age, educational background, and work experience, Sections 404.1569 and 416.969 and Rule 201.21, Table 1, Appendix 2, Subpart P, Regulations No. 4, would direct a conclusion of "not disabled."

11. Although the claimant is unable to perform the full range of sedentary work, she is capable of making an adjustment to work which exists in significant numbers in the national economy. Such work includes employment as a security (surveillance) monitor, with over 75,000 such jobs in the national economy and 300 of those in Kansas; a cafeteria cashier, with over 162,000 such jobs in the national economy and 1,050 of those in Kansas; and an office helper, with 51,000 such jobs in the national economy and 500 of those in Kansas. A finding of "not disabled" is therefore reached within the framework of the above-cited rule.

12. The claimant has not been under a disability, as defined in the Social

Security Act, at any time through the date of this decision.

Tr. 24–26.

## IV. Standard of Review

 The ALJ's decision is binding on the Court if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Dixon v. Heckler*, 811 F.2d 506, 508 (10th Cir.1987). The Court must determine whether the record contains substantial evidence to support the decision and whether the ALJ applied the proper legal standards. *See Castellano v. Sec'y of HHS*, 26 F.3d 1027, 1028 (10th Cir.1994). While "more than a mere scintilla," substantial evidence is only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). The court must scrutinize the record and take into account any evidence which fairly detracts from the evidence which supports the Secretary's findings. *See Nieto v. Heckler*, 750 F.2d 59 (10th Cir.1984). Evidence is not substantial "if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Knipe v. Heckler*, 755 F.2d 141, 145 (10th Cir.1985) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).

## V. Analysis

 Plaintiff bears the burden of proving disability under the SSA. *See Henrie v. United States Dep't of HHS*, 13 F.3d 359, 360 (10th Cir.1993); *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir.1989). The SSA defines "disability" as the inability to engage in any substantial gainful activity for at least twelve months due to a medically determinable impairment. *See* 42 U.S.C.A. § 423(d)(1)(A). To determine whether a claimant is disabled, the Commissioner applies a five-step sequential evaluation: (1) whether the claimant is currently working; (2) whether the claimant suffers from a severe impairment or combination of impairments; (3) whether the impairment meets an impairment listed in Appendix 1 of the relevant regulation; (4) whether the impairment prevents the claimant from continuing her past relevant work; and (5) whether the impairment prevents the claimant from doing any kind of work. *See* 20 C.F.R. §§ 404.1520, 416.920 (1996). If a claimant satisfies steps one, two and three, she is disabled; if a claimant satisfies steps one and two, but not three, then she must satisfy step four. If she satisfies step four, the burden shifts to the Commissioner to establish that the claimant is capable of performing work in the national economy. *See Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir.1988).

In this case, the ALJ denied benefits at step five, finding that although plaintiff's impairments prevent her from performing past relevant work, she is capable of performing other jobs which exist in significant numbers in the national economy. Tr. 25–26. In doing so, the ALJ discounted plaintiff's credibility based on the following factors: (1) inconsistencies between plaintiff's testimony and her earlier statements to medical sources; (2) plaintiff's lack of motivation to work based on lack of substantial earnings, sporadic work history and care of her husband; and (3) plaintiff's allegations of numerous impairments and symptoms for which she did not submit medical documentation. Tr. 22.

 Plaintiff challenges the ALJ's credibility determination, arguing that the ALJ ignored medical evidence which supports plaintiff's subjective complaints and improperly discounted plaintiff's credibility based on lack of motivation to work. The Tenth Circuit has set forth the following factors for analyzing subjective complaints

of disabling conditions: (1) whether claimant proves with objective medical evidence an impairment that causes the subjective condition; (2) whether a loose nexus exists between the impairment and the subjective condition; and (3) whether the subjective condition is disabling based upon all objective and subjective evidence. *See Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir. 1994); *Luna v. Bowen,* 834 F.2d 161, 163–64 (10th Cir.1987). If plaintiff satisfies the first two factors, the ALJ must consider plaintiff's assertions regarding subjective conditions and decide whether he believes them. *See Luna,* 834 F.2d at 163. In determining the credibility of plaintiff's testimony, the ALJ should consider such factors as

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Huston v. Bowen,* 838 F.2d 1125, 1132 (10th Cir.1988).

■■■ In reviewing the credibility determination, the Court should "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility." *Casias v. Sec'y of HHS,* 933 F.2d 799, 801 (10th Cir.1991). Credibility is the province of the ALJ. *Hamilton v. Sec'y of HHS,* 961 F.2d 1495, 1499 (10th Cir.1992). At the same time, the ALJ must explain why specific evidence relevant to each factor supports a conclusion that a claimant's subjective complaints are not credible. *See Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir.1995); *but see Qualls v. Apfel,* 206 F.3d 1368, 1372 (10th

Cir.2000) (*Kepler* does not require formalistic factor-by-factor recitation of evidence). Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings. *Kepler,* 68 F.3d at 391 (quoting *Huston,* 838 F.2d at 1133) (footnote omitted). In making a finding about the credibility of an individual's statements, the adjudicator need not totally accept or totally reject the individual's statements. *See* Social Security Ruling 96–7p, 61 Fed.Reg. at 34486. Rather, the ALJ "may find all, only some, or none of an individual's allegations to be credible." *See id.*

■■■ As an initial matter, the Court notes that plaintiff does not challenge the ALJ's decision to discount plaintiff's credibility based on discrepancies between her testimony and the medical record. At the hearing on October 18, 1999, plaintiff testified that (1) she has been lying in bed with her feet propped up for back pain every day for the past six or seven months, since she discontinued vicodin; (2) that her condition has deteriorated significantly in the last six months; (3) that she cannot perform house work; and (4) that she does not take care of her husband in any way. Tr. 42–43, 50, 56, 63. About four months before the hearing, however, on June 9, 1999, plaintiff told Ms. Peterson that she was responsible for all of the domestic burden and caring for her ill husband and ill brother-in-law. Tr. 327. Less than three months before the hearing, on August 5, 1999, plaintiff reported that she was feeling better than she had in a long time. Tr. 330. About six weeks before the hearing, on September 3, 1999, plaintiff presented no complaints to the clinic and reported that neurontin was helping her leg pain and that she planned to go out of town for two months. Tr. 331. Substantial evidence supports the ALJ's decision

to discount plaintiff's credibility based on these inconsistencies. *See, e.g., Barrow v. Massanari,* No. 00–2467, 2001 WL 741718, *12 (D.Kan. July 2, 2001) (discrepancy between plaintiff's testimony and information contained in medical records sufficient basis to discount plaintiff's testimony); *Eiting v. Apfel,* 44 F.Supp.2d 1008, 1020–21 (E.D.Mo.1999) (inconsistencies in record support ALJ decision to discount claimant's testimony). The Court therefore defers to the ALJ's credibility decision.

■■■ Substantial evidence also supports the ALJ's conclusion that plaintiff lacks motivation to work. Plaintiff asserts that the ALJ failed to consider the fact that her back injury in 1984 could have interfered with her ability to work or sustain employment. The evidence demonstrates, however, that plaintiff has consistently earned an average of less than $2,000 per year since 1967. *See* fn. 4, *supra.* This fact supports the ALJ's credibility determination. *See Bean v. Chater,* 77 F.3d 1210, 1213 (10th Cir.1995) (plaintiff's poor work history relevant to credibility of subjective complaints). Likewise, plaintiff's statements to medical personnel regarding the amount of care she is required to give her husband supports the ALJ's conclusion. *See, e.g., Barrow,* 2001 WL 741718 at *13.

■■■ Plaintiff argues that the ALJ ignored medical evidence which supports her subjective complaints regarding her inability to work. The ALJ found that plaintiff had alleged numerous impairments and symptoms other than back and lower extremity pain "for which she did not submit any medical documentation." Tr. 22. Plaintiff correctly points out that her complaints of right elbow pain, asthma, hypertension, hypothyroidism and depression are documented in the medical evidence. However, nothing in the medical records supports plaintiff's claim that any of these conditions, alone or in combination, prevent plaintiff from working. *See, e.g.,*

*Luna,* 834 F.2d at 165–66 (lack of objective medical evidence to support degree of pain alleged by claimant is important factor to consider in evaluating claim of disabling pain); *Talley v. Sullivan,* 908 F.2d 585, 587 (10th Cir.1990) (medical records must be consistent with nonmedical testimony as to severity of pain). Moreover, the record demonstrates that these conditions are effectively controlled with medication. *See Dixon,* 811 F.2d at 508 (conditions controlled with medication cannot serve as basis for disability). In sum, substantial evidence supports the ALJ conclusions. The Court therefore defers to the ALJ's decision to discount plaintiff's credibility with regard to her subjective complaints.

## VI. Hypothetical Question To Vocational Expert

■■■ Plaintiff asserts that the ALJ's decision is not supported by substantial evidence because he relied on a hypothetical question to the vocational expert which did not include plaintiff's testimony that she needs to lie down during the day to relieve her back and leg pain. Hypothetical questions must include a full description of a claimant's impairments in order for the testimony elicited by such questions to constitute substantial evidence to support the ALJ's decision. *See Hargis v. Sullivan,* 945 F.2d 1482, 1492 (10th Cir. 1991). In formulating the hypothetical question, however, the ALJ need not include any alleged limitations which he does not accept as true. *See Roberts v. Heckler,* 783 F.2d 110, 112 (8th Cir.1985). Rather, the ALJ may restrict his hypothetical to those limitations which he has found to exist based upon substantial evidence in the record. *See Gay v. Sullivan,* 986 F.2d 1336, 1341 (10th Cir.1993). As discussed above, substantial evidence supports the ALJ's decision to discount plaintiff's credibility. Thus the ALJ did not err in relying on the hypothetical question

which omitted plaintiff's subjective claim that she needs to lie down during the day.

**IT IS THEREFORE ORDERED** that plaintiff's *Motion For Judgment* (Doc. # 6) filed November 21, 2001 be and hereby is **OVERRULED**.